# EXHIBIT A



## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Tue, Jan 4, 2022

**Server Name:**             Jimmy Lizama

| Entity Served | MENTOR WORLDWIDE, LLC |
|---|---|
| Case Number | 37-2021-00046860-CU-PL-NC |
| Jurisdiction | CA |



Exhibit A - Page 4

#1582 15

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>MICHAEL NICCOLE, M.D., an individual; MENTOR WORLDWIDE, LLC and DOES 1-100, inclusive<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>BEVERLY ROSE AND JACK G. ROSE, wife and husband, | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**11/04/2021** at 10:23:38 AM<br>Clerk of the Superior Court<br>By Amy Woolf, Deputy Clerk |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Diego Superior Court<br>325 South Melrose Drive, Vista, CA 92081 | CASE NUMBER:<br>*(Número del Caso):*<br>37-2021-00046860-CU-PL-NC |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jennifer A. Lenze, Esq.  1300 Highland Avenue, Suite 207 Manhattan Beach, CA 90266 T(310) 322-8800
Lenze Lawyers, PLC

| | | | |
|---|---|---|---|
| DATE:  11/04/2021<br>*(Fecha)* | Clerk, by<br>*(Secretario)* | A. Woolf | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* **MENTOR WORLDWIDE, LLC**
   under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* Corporation Code: 17061 (Limited Liability Company)
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com |

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

Exhibit A - Page 5

1   Jennifer A. Lenze, CA Bar # 246858

2   **LENZE LAWYERS, PLC**
    1300 Highland Avenue, Suite 207

3   Manhattan Beach, CA 90266
    Telephone: (310) 322-8800

4   Facsimile: (310) 322-8811
    jlenze@lenzelawyers.com

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**11/04/2021** at 10:23:38 AM
Clerk of the Superior Court
By Amy Woolf, Deputy Clerk

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| BEVERLY ROSE AND JACK G. ROSE, wife and husband, | CASE NO.   37-2021-00046860-CU-PL-NC |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| MICHAEL NICCOLE, M.D., MENTOR WORLDWIDE, LLC and DOES 1-100, inclusive, | 1. Strict Product Liability-Failure to Warn<br>2. Strict Product Liability-Manufacturing Defect<br>3. Negligence<br>4. Intentional Misrepresentation/ Concealment<br>5. Negligent Misrepresentation/ Concealment<br>6. Loss of Consortium |
| Defendants | |

Plaintiffs, by and through the undersigned counsel, hereby brings this action against Defendants

MICHAEL NICCOLE, M.D., an individual; MENTOR WORLDWIDE, LLC; and DOES 1 through 100,

inclusive, (hereinafter collectively referred to as "Defendants"), and each of them, hereby allege as

follows:

## INTRODUCTION

1.      Plaintiffs BEVERLY ROSE and JACK G. ROSE, husband and wife, file this Complaint

to more specifically plead facts that support parallel state-law claims that are not preempted by 21

U.S.C. § 360k(a).  As shown herein, MENTOR® SILTEX® *textured* breast implant products caused

Beverly Rose to develop Breast Implant Associated Large Cell Lymphoma ("BIA-ALCL") -- a rare

-1-

form of cancer -- as a direct and proximate result of violations of FDA laws, regulations and requirements applicable to manufacturing, warnings and post-marketing requirements.

2.      Defendant Mentor Worldwide LLC (hereinafter "MENTOR") cannot avoid civil liability for these defective implants by asserting a preemption defense because Defendant failed to comply with:  critical QSR & CGMP requirements required by the Food & Drug Administration ("FDA"); the FDA's Premarket Approval Application requirements; and FDA requirements to warn consumers of the known dangers and known adverse events as required by conditions of approval and post-marketing regulations.

3.      Mentor's SILTEX® breast implant manufacturing process create a textured silicone surface by pressing an uncured silicone mandrel into polyurethane foam. This texturing process produces defective and *adulterated* implants with excessive silicone *debris* fragments and particles that remained on the implant surface in violation of FDA quality system requirements ("QSRs") and current good manufacturing practices ("CGMPs").[1]

4.      Plaintiffs bring this action against Defendants in relation to the manufacture, marketing, and distribution of Mentor Breast Implants, the repeated failure to follow the requirements imposed by FDA, failure to warn consumers and healthcare providers of known dangers and known adverse events, and reckless violation of state law.

5.      Defendant MENTOR WORLDWIDE, LLC ("MENTOR") is a limited liability company incorporated under the laws of the State of Delaware, with its principal place of business located at 201 Mentor Drive, Santa Barbara, California 93111, and its headquarters at 33 Technology Drive, Irvine, California 92618.

---

[1]  The failure to follow the CGMPs and QSRs precludes a preemption defense and provides a basis for liability as violations of federal law that are parallel state law claims. *See Warren v. Howmedica Osteonics Corp.*, No. 4:10 CV 1346 DDN, 2011 U.S. Dist. LEXIS 32643, at *9 n.2 (E.D. Mo. Mar. 29, 2011). In addition, because Plaintiffs allege the implants were "adulterated" by foreign, decomposed and injurious unwanted silicone particles, federal law specifically incorporates CGMPs. 21 U.S.C. § 351.

COMPLAINT AND DEMAND FOR JURY TRIAL Exhibit A - Page 7

6.     Defendant MICHAEL NICCOLE, M.D., was and is licensed to practice medicine in the State of California, and does practice medicine in this State.

7.     Upon information and belief, Defendant MICHAEL NICCOLE, M.D.  practices medicine at 1101 Bayside Drive, Suite 200 Corona Del Mar, California 92625.

8.     Founded in 1969, MENTOR originally sold electronic laboratory instruments to measure activity within the nervous system. After introducing urethral catheters in the l970s, the company began delving into the plastic surgery field in the mid-l980s.

9.     MENTOR now touts itself as the global leader in aesthetic medicine, and the U.S. market leader in breast aesthetics.

10.     For decades, MENTOR's products have been implanted into millions of women's breasts and MENTOR remains a leading supplier of medical products for the global aesthetic medicine market.

11.     But MENTOR's products pose a significant risk—a risk that was *long* hidden and buried by MENTOR in advertisements, flyers, reports, and other communications to both the marketplace and the FDA. MENTOR's Silicone Textured Breast Implants have a surface roughness significantly *higher* than the industry standard and are capable of embedding silicone surface particles in the fibrous scar tissue that naturally forms around the implant, known as the "capsule."

12.     In part because of that flaw, the medical and scientific consensus has determined that the extreme texturing of the implants, when combined with a bacterial accumulation or a genetic predisposition, form a perfect storm for the development of Breast Implant Associated–Anaplastic Large Cell Lymphoma (BIA-ALCL).  BIA-ALCL is an uncommon but emerging subtype of non-Hodgkin's lymphoma—a cancer that originates from lymphatic cells, which are part of the immune system.  BIA-ALCL is thus a cancer of the immune system, and *not* a type of breast cancer. It presents as a late-onset seroma in the breast (accumulation of fluid between the capsule and the implant, resulting in the swelling of the breast) with high CD30 expression and an absence of anaplastic lymphoma kinase (ALK).

///

Exhibit A - Page 8

13.   .   BIA-ALCL is a deadly blood and lymphatic cancer that cannot just be cut out of the body. BIA-ALCL is drastically more deadly because it spreads throughout the entire body. This type of cancer can lead to more imminent death.

14.   By way of background, attempts to augment women's breasts date back to the 1880s, however implants as we know them today hit the market in the 1960s. Early versions of implants had thick shells to keep rupture rates low but, ultimately led to a complication called capsular contracture. This results from the growth of scar tissue around the implant (due to a foreign body reaction) causing it to become thick and constrict the implant. This causes pain and can lead to severe aesthetic problems.

15.   The 1970s brought about the first type of "texturing" in the form of a polyurethane foam coating on the implant shell in an attempt to reduce capsular contracture. These were removed from the market in 1991 due to reporting of an association between polyurethane and cancer concerns. The texturing process evolved in the 1980s with different technologies, yet the theory remained the same – the growth of tissue into the irregular spaces of the shell would prevent collagen and fibrous tissue from forming in excess – and uniform-around the implant capsule.

16.   At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other.

17.   The combined acts and/or omissions of each Defendant resulted in indivisible injuries to Plaintiff. Each of the above-named Defendants is a joint tortfeasor and/or co-conspirator and is jointly and severally liable to Plaintiffs for the negligent acts and omissions alleged herein.  Each of the above-named Defendants directed, authorized and/or ratified the conduct of each and every other Defendant.

18.   At all relevant times, Defendants acted in concert with one another in the State of California to fraudulently convey false and misleading information concerning Mentor Breast Implants, and concealed the risks of serious adverse events associated with its breast implants from Plaintiff Beverly Rose, her physician, the public, and other healthcare providers. But for Defendants' actions, Plaintiff Beverly Rose would not have suffered the severe injuries and harms that have resulted from implantation of Mentor Breast Implants into Plaintiff Beverly Rose's body.

19.     This Court has personal jurisdiction over Defendants. Defendants are, and at all material times were, residents of and/or authorized to conduct business in the State of California.  Defendants conducted such business within the State including acts which caused or contributed to Plaintiffs' injuries.

20.     At all material times, Defendants maintained systematic and continuous contacts within this jurisdiction, employed numerous individuals in this district and regularly availed themselves of the benefits of this judicial district.  Defendants received substantial financial gain as a result of designing, formulating, testing, packaging, labeling, producing, assembling, advertising, marketing, promoting, distributing, manufacturing, and selling the product within this jurisdiction.

21.     Venue is proper in this county in accordance with Section 395 of the California Code of Civil Procedure because the injuries alleged herein arose from conduct that occurred in this county.

22.     Plaintiffs are informed and believe and, on that basis allege that Defendants have purposefully directed their activities at this forum State and the exercise of jurisdiction is reasonable and would not offend the traditional notions of fair play and substantial justice.

23.     Plaintiffs are informed and believe and, on that basis, allege that Defendants have purposefully availed themselves of the privileges and benefits of conducting activities and business within the forum State, and have invoked the benefits and protections of its laws.

24.     A substantial part of the events giving rise to Plaintiff's claims occurred in California, including federal and state regulatory compliance, the preparation and submission of the relevant product PMAs, and communication regarding the product, the design, formulation, testing, packaging, labeling, production, creation, construction, making, assembly, advertising, clinical testing, marketing, promotion, distribution, manufacturing, and selling of the Silicone Textured Breast Implants, as well as the implantation of the Silicone Textured Breast Implants into Plaintiff in this forum.

///

///

///

-5-

## FACTS REGARDING MENTOR® BREAST IMPLANTS

### General Information Relating To Breast Implants

25.     Silicones, which are also called polysiloxanes, are polymers that include a synthetic compound made up of repeating chains of alternating silicon and oxygen atoms, frequently combined with carbon and/or hydrogen.  Silicones are typically   heat-resistant   and rubber-like, and are used in sealants, adhesives, lubricants, medicine, cooking utensils, and thermal and electrical insulation. Being purely synthetic, silicones do not exist in nature.

26.     A breast implant is a prosthetic product used to change the size, shape, and contour of a woman's breast. There are three general types of breast implant products, defined by their filler material: saline solution, silicone gel, and composite filler.

27.     Silicone gel-filled breast implants have a silicone outer shell that is filled with silicone gel. They are available in various sizes and can have either a smooth or textured shell. Silicone gel-filled breast implants are approved for breast augmentation in women age 22 or older and for breast reconstruction in women of any age.

28.     In 1976, Congress passed the Medical Device Amendments ("MDA") to the federal Food, Drug and Cosmetic Act ("FDCA"). Upon enactment of the MDA, the FDA deemed saline-filled breast implants as Class II devices, to be reviewed through a premarket notification process. The devices could be publicly sold so long as manufacturers later provided "reasonable assurance" of the products' safety and effectiveness. 21 U.S.C. § 360e(d)(2).

29.     In 1988, in response to growing safety concerns, the FDA re-classified both saline-filled and silicone gel-filled breast implants as Class III devices requiring premarket approval ("PMA").

30.     In April 1991, upon final publication of new regulations, FDA began requiring breast implant manufacturers to obtain specific premarket approval by the FDA for any silicone gel-filled breast implants.

31.     Through its PMA process, the FDA engages in scientific evaluations of the safety and effectiveness of Class III medical devices. The FDA considers Class III devices to create the greatest

Exhibit A - Page 11

risk to human safety, necessitating the implementation of special controls, including the requirement to obtain PMA under 21 U.S.C. § 360 prior to marketing the product to the public.

32.     A PMA application must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue. A PMA and/or PMA Supplement application must provide:

a.     Proposed indications for use;

b.     Device description including the manufacturing process;

c.     Any marketing history;

d.     Summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk);

e.     Each of the functional components or ingredients of the device;

f.     Methods used in manufacturing the device, including compliance with current good manufacturing practices; and

g.     Any other data or information relevant to an evaluation of the safety and effectiveness of the device known or that should be reasonably be known to the manufacturer from any source, including information derived from investigations other than those proposed in the application from commercial marketing experience.

33.     Where Conditional Premarket Approval ("CPMA") is granted, a device marketed by a manufacturer which fails to perform any requirements of the CPMA is considered to be adulterated under § 501 of the FDCA and may not be further marketed.

34.     In November 1991, the FDA held an Advisory Panel meeting to discuss several PMAs for silicone gel-filled breast implants. While the Advisory Panel concluded that the manufacturers had

failed to provide adequate safety and effectiveness data for their implants, they unanimously recommended that the FDA permit the implants to remain on the market.

35.     In January 1992, the FDA announced a voluntary moratorium on silicone gel- filled breast implants, requesting that the manufacturers stop supplying them and that surgeons stop implanting them while the FDA engaged in a further review of the products' safety and effectiveness.

36.     In April 1992, the FDA determined that none of the PMAs submitted for silicone gel-filled breast implants contained sufficient data to support premarket approval for silicone breast implants. From that time, implantation of the products in the United States was limited to reconstruction and revision patients.

37.     On December 12, 2003, Mentor submitted a PMA application to FDA for its MemoryGel™ silicone gel-filled breast implants.

38.     On November 17, 2006, the FDA approved Mentor's PMA for its MemoryGel™ Silicone Gel-Filled Breast Implants, subject to certain conditions.  One of the conditions was that Mentor was required to conduct six post-approval studies to further characterize the safety and effectiveness of its silicone gel-filled breast implants and to answer long term questions that the clinical trials were not designed to answer. Specifically, the FDA required Mentor to: (a) Continue and complete the "Core" post-approval study; (b) Conduct a large post-approval study to assess long-term outcomes and identify rare adverse events and follow patients for ten years; (c) Conduct a device-failure study in concert with their large post-approval study to further identify the modes and causes of failure of explanted devices over the ten-year period; (d) Complete a focus-group  study  to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the use of silicone breast implants; (e) Complete an informed decision study to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants; and (f) Complete the "adjunct" study and continue to follow existing participants through their five-year post-implant evaluations.

///

///

39.     Mentor failed to properly perform the six studies, failed to follow up with enough participants and did not fully report adverse events. Accordingly, the information which the FDA was seeking regarding adverse events and device failures was never gathered.

40.     For example, the "Core" study involved 1008 patients and Mentor was required to continue to follow these patients for the ten years following implantation to assess the long-term clinical performance of the silicone gel-filled implants.  This was required to include 11 follow-up visits, at six months post-operation, and annually for ten years after surgery.

41.     The FDA also stated that all non-MRI patients should have an MRI at years six, eight, and ten, and that all patients who were explanted without replacement were to be evaluated through ten years.

42.     Mentor was further required to update the patient and physician labeling or its product to reflect the results of the five- and ten-year Core Study findings and to report to the FDA significant new information regardless of when the information became available.

43.     Although the actual follow-up rates for the "Core" study at nine years post-implant were only 59 percent, Mentor reported that the follow-up rate at ten years post-implant was 62 percent.

44.     Furthermore, while the FDA requirements specifically mandated evaluation through ten years, the core post-approval study report schedule illustrates that reporting was only done for six years.

45.     There were also other significant flaws and shortcomings in the information which Mentor provided to the FDA related to this study.

46.     The lack of a sufficient statistical sample, due to the low follow-up rate, as well as the inconsistent data and the failure of Mentor to ensure that the study was completed violated the FDA requirements and significantly limited the information available regarding the long-term effects of use of the product.

47.     he manner in which Mentor conducted the large Post-Approval Study (the "Large" study) and reported the information which it did gather was equally flawed.

///

48.     The purpose for the "Large" study was to address specific issues such as long term local complications experienced by patients, such as connective tissue disease ("CTD"), CTD signs and symptoms, neurological disease, neurological signs and symptoms; offspring, reproductive, and lactation issues; cancer rates, suicide, mammography  issues, rupture results, and MRI compliance.

49.     The study data was to be collected through annual patient questionnaires completed over the internet, by mail, or by telephone.

50.     The study also required physician evaluations at years one, four to six, nine and ten to collect data on complications.

51.     Mentor was required to update their patient and physician labeling to reflect the five- and ten-year study findings, as well as at any other time if necessary, to report significantly new information from the study.

52.     As with the other mandated studies, the follow up rate for the "Large" study was so low that the information obtained was not sufficient to allow for the identification of problems and adverse effects from long term use of the product.

53.     By the seventh year of this study, the overall follow-up rate was 20.1 percent (approximately 8,331 participants out of 41,452), leaving 79.9 percent of the desired statistics unavailable for evaluation.

54.     This was a study of significant importance required by the FDA for post-market approval. The study was designed to address a critical spectrum of health issues for women with breast implants. Mentor did not comply with the required data collection. With nearly an 80 percent dropout rate, the study failed to collect data to demonstrate that use of the Mentor silicone gel implants was safe.

55.     The inadequate results are even more disconcerting because the data collection was designed to examine reasons for reoperation, previously unevaluated, including MRI results, and rheumatologic or neurological symptoms.

56.     The lack of participation and reliable results from this study further shows that Mentor has failed to comply with FDA requirements.

57. Mentor did not follow through with required data collection. The Year 1 follow-up rate of surgeon visit for study participants was 22.8 percent, leaving nearly 80 percent unaccounted for. Similarly, the Year 1, 2, and 3 follow-up rates were 21.4 percent, 24.3 percent, and 23.0 percent, respectively, leaving nearly 80 percent unaccounted for. At Year 7, the overall follow-up rate was 20.1 percent; leaving 79.9 percent of participants unaccounted for and did not have follow-ups for data collection. No follow-up rates were provided for the ten-year data collection.

58. These follow-up rates were too low for Mentor to provide meaningful safety information to the FDA and insufficient to allow for the identification of adverse effects or other problems resulting from long-term use of the product.

59. Mentor was also required to conduct a Device Failure Study to ascertain the reasons for, and frequency of, device failure. Specifically, the FDA required that "Mentor must continue preclinical studies to characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large post-approval study."

60. The study design involved two components: 1) the collection of implant/surgery information and clinical data at the time of explantation, and 2) visual inspection and physical testing of the explanted devices. No study population was stated, and there was no patient follow-up.

61. Mentor's Device Failure post-approval study failed to contain an adequate sample size to provide meaningful data.

62. Further, Mentor's Device Failure post-approval study report of summary findings failed to meet the requirements established by the FDA as it did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of the FDA's requirements.

63. Mentor was also required to conduct a Focus Group Study to gather information regarding the adequacy of the format and content of the approved product labeling.

///

64. Mentor used an inadequate number of individuals to properly evaluate how patients understood the safety and labeling brochures.

65. The FDA also required that Mentor conduct as Informed Decision Study to determine the success of the informed decision process provided to women who seek breast implant surgery. Both the physician and the patient were intended to sign designated sections in order to best assure that the patient had obtained the labeling in sufficient time prior to surgery to read it and understand the risks and other information associated with the Mentor device.

66. Mentor failed to provide sufficient information regarding the methodology used or the results obtained from this study.

67. The FDA further mandated that Mentor continue the Adjunct Study, which had been approved in 1992, including the requirement that Mentor continue to follow-up on all patients currently enrolled in that study for five years. The data from this follow-up was to be reported as part of the annual reports required by the FDA.

68. The Adjunct Study was designed to follow-up with patients post-operatively at Years 1, 3, and 5 to assess satisfaction and occurrence of local complications. The study was to gather data regarding short-term and local (tissue) implant complications.

69. The overall patient follow-up rates declined as follows: Year 1 – 44 percent; Year 3 - 24.7 percent; and Year 5 - 13.8 percent.  Mentor sought to attribute the poor follow up rates to a lack of patient compliance.  Mentor also admitted that the lack of sufficient data significantly limited interpretation of the available safety results.

70. In addition to Mentor's failure to follow up on the Post-Approval Studies, from the time of the investigational device exemption ("IDE") until today, Mentor is solely responsible for designating and reporting all injuries as they relate to its breast implants, and reporting any related injuries to the FDA and health care providers as required under both Connecticut state and federal law. The details regarding this information remain solely in the hands of the Defendants.

///

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A - Page 17

71.    Had Mentor properly performed its required studies and reported the multitude of captured adverse events, the FDA would have included the adverse events in the MAUDE database.

72.    On information and belief, Plaintiffs allege that if injuries, including the occurrences of diagnosed cases of BIA-ALCL, had been properly reported, Plaintiff Beverly Rose and Plaintiff's implanting physician would have been notified of the risk of developing BIA-ALCL with Mentor Breast Implants and would not have chosen Mentor textured implants. Plaintiffs thus aver "but-for causation."

73.    Information Specific to Mentor MemoryGel Breast Implants

74.    On November 2006, Mentor's Premarket application for its MemoryGel breast implants was approved by the FDA.

75.    As conditions of approval, the FDA required Mentor to conduct six post-approval studies to characterize the long-term performance and safety of the devices. The post-approval studies for Mentor's MemoryGel silicone-filled breast implants included:

   a.  **Core** Post-Approval Study (Core Study) – To assess long-term clinical performance of breast implants in women that enrolled in studies to support premarket approval applications. These studies were designed to follow women for 10 years after initial implantation.

   b.  **Large** Post-Approval Study (Large Study) – To assess long-term outcomes and identify rare adverse events by enrolling more than 40,000 silicone gel-filled breast implant patients, following them for 10-years.

   c.  **Device** Failure Study (Failure Study) – To further characterize the modes and causes of failure of explanted devices over a 10-year period.

   d.  **Focus** Group Study – To improve the format and content of the patient labeling.

   e.  **Annual** Physician Informed Decision Survey (Informed Decision Study) – To monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants.

COMPLAINT AND DEMAND FOR JURY TRIAL

f.  Adjunct Study – To provide performance and safety information about silicone gel-filled breast implants provided to U.S. women from 1992-2006, prior to approval, when implants could only be used for reconstruction and replacement of existing implants.

76.  In the PMA, the FDA further stated, "[f]ailure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA."

77.  The FDA continued, "The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law."

78.  Mentor's obligations after the PMA included, but are not limited to:

a.  Reporting to the FDA information suggesting that one of the manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur [21 C.F.R. § 803.50];

b.  Monitoring the product and reporting to the FDA any complaints about its performance and any adverse health consequences that are or may be attributable to the product [21 C.F.R. § 814];

c.  Submitting a PMA supplement for any listed or material changes to the product [21 C.F.R. § 814.39];

d.  Following quality system requirements, found in 21 C.F.R. § 820, the CGMPs, that require manufacturers do the following:

o  Establish and implement a quality policy which all aspects of the manufacturer's operations must meet [21 C.F.R. § 820.20];

///

///

-14-

o   Establish and maintain procedures for validating the device design, including testing of production units under actual or stimulated use conditions, and creation of a risk plan and conduction of risk analyses [21 C.F.R. § 820.30];

o   Document all Corrective Action and Preventative Actions taken by the manufacturer to address non-conformance and other internal quality control issues [21 C.F.R. § 820.100];

o   Establish internal procedures for reviewing complaints and event reports [21 C.F.R. §§ 820.198, 820.100, 820.20];

o   Establish Quality Management System (QMS) procedures to assess potential causes of quality problems, including non-conforming products [21 C.F.R. §§ 820.70 and 820.90];

o   **Maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality [21 C.F.R. § 820.70(e)];**

o   Ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use [21 C.F.R. § 820.70(g)];[2]

---

[2] The applicable statutes states:

Adulterated drugs and devices
A drug or device shall be deemed to be adulterated—
(a) Poisonous, insanitary, etc., ingredients; adequate controls in manufacture.

(1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2)(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter...

-15-

      o   **Establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality [21 C.F.R. § 820.70(h)];**

    f.   Reporting on Post-Approval Studies in a timely fashion [21 C.F.R. § 814.80]; and

    g.   Advertising the device accurately and truthfully [21 C.F.R. § 801].

    79.    The primary responsibility for timely and accurately communicating complete, accurate and current safety and efficacy information related to medical device, such as Mentor® Breast Implants, rests with the manufacturer.

    80.    This primary reporting obligation instills in a manufacturer, such as Mentor, a duty to vigilantly monitor all reasonably available information, to closely track clinical experiences, and to fully

---

21 U.S.C. § 351 (2019).

Section 351(h) defines an adulterated device, in part, as a device where "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable" CGMP requirements. 21 U.S.C. § 351(h). A CGMP requirement relating to manufacturing material provides:

> **Where a manufacturing material could reasonably be expected to have an adverse effect on product quality, the manufacturer shall establish and maintain procedures for the use and removal of such manufacturing material to ensure that it is removed or limited to an amount that does not adversely affect the device's quality. The removal or reduction of such manufacturing material shall be documented.**

21 C.F.R. § 820.70 (emphasis added),

---

and promptly report all relevant information, specifically but not limited to adverse events, to the FDA, the healthcare community, and consumers.

81.     Similarly, under state law, which does not impose duties or requirements materially different from those imposed by federal law, the manufacturer must precisely monitor its own manufacturing and quality control processes, and its market representations and warranties.

82.     These duties establish that time is of the essence for Mentor when reporting adverse events, especially, but not limited to, those adverse events indicating an association between its product and breast cancer, Anaplastic Large-Cell Lymphoma ("ALCL") and/or BIA-ALCL.

83.     Delayed reporting prevents the healthcare community and the public from timelylearning of risks which must inevitably play a part in their decision-making, by both physiciansand consumers, regarding treatments and procedures, and thereby expose countless additionalwomen to potential harm.

84.     In 2016, the FDA approved Mentor's revised study protocol to modify the MemoryShape® Post-Approval Study (Requirement 3 in the PMA) to include both MemoryShape® and MemoryGel® devices in one study called the "MemoryGel® and Shape Glow Study."

85.     Based on the approved revised study protocol, Mentor was required to conduct a ten-year post-approval observational study to include a total of 2,518 women undergoing breast augmentation, breast reconstruction, or revision surgery with MemoryShape® or MemoryGel® Breast Implants.

86.     By February and August 2017, Mentor had failed to enroll the required number of participants in the study but nonetheless received a "progress adequate" letter from the FDA as it had met enrollment milestones.  However, the FDA noted that if enrollment rates did not improve, it would not reach the required enrolment rate per the approved study protocol.

87.     In February 2018, Mentor issued the following in a press release – "Mentor Worldwide LLC, a global leader in breast aesthetics and part of the Johnson & Johnson Medical Devices companies,

announced today the Plastic and Reconstructive Surgery® publication of a U.S.-based 10-year clinical study involving 955 patients which highlights the safety of MENTOR® MemoryShape Gel Breast Implants." See Plastic and Reconstructive Surgery Journal Publishes Ten-Year Clinical Study Data Highlighting Safety of MENTOR® MemoryShape® Gel Breast Implants, Feb. 14, 2018, available at https://www.jnjmedicaldevices.com/en-US/news-events/plastic-and-reconstructive-surgery-journal-publishes-ten-year-clinical-study-data (last viewed September 30, 2020) (emphasis added).

88.     The report provided information on Mentor's MemoryShape "Breast Implant Core Study". See id.

89.     By December 2018, Mentor had enrolled only 102 MemoryShape participants.

90.     On March 18, 2019, Mentor received a warning letter from the FDA setting forth numerous violations of its PMA requirements. *See* Ann M. Ferriter, *Warning Letter to Mentor Worldwide LLC*, March 18, 2019, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mentor-worldwide-llc-acclarent-573520-03182019 (last viewed September 30, 2020).

91.     The FDA spelled out seven specific compliance failures by Mentor, including:

    g.     Failure to evaluate "the long-term clinical performance of MemoryShape Breast Implants under general conditions of use in the post-market environment."

    h.     Failure to "enroll 2,518 women receiving MemoryShape Breast Implants and 300 women undergoing other aesthetic surgery as the comparison group."

    i.     Failure to "follow the study subjects annually for 10 years."

92.     This letter from FDA was addressed to Alex Gorsky as the Chairman and CEO of Mentor. Gorsky is also, and has been since 2012, the Chairman and CEO of J&J. *See* https://www.jnj.com/leadership/alex-gorsky (last viewed September 30, 2020).

93.     Mentor was given 15 working days from the date of the letter to provide a plan to address the issues and has yet to comply with this request.

-18-

94.     After sending the March 2019 warning letter, the FDA allowed Mentor more time to meet its target follow-up and enrollment rates and the opportunity to address the data inconsistencies received in its reports.

95.     In the FDA's March 2019 warning letter, supra, the FDA concluded that, based on Mentor's failure to enroll the required number of study participants, the FDA is unable to adequately evaluate the safety, effectiveness and reliability of these implants. The FDA stated, "[y]ou are thereby in violation of the requirements established as condition to your device's approval under 21 C.F.R. § 814.82(a). Failure to promptly correct this failure may result in withdrawal of your PMA under 21 C.F.R. § 814.82(c)." (emphasis added).

96.     In addition to the failures set forth in the FDA's March 2019 waning letter, Mentor also failed to report adverse events, including incidences of BIA-ALCL, from the post-market approval studies commissioned as part of the implant's PMA approval.

97.     Despite its admonitions from the FDA, Mentor continues to brought the implants proven design.

98.     Mentor's continued warranties of safety and effectiveness are contrary to the FDA's March 2019 warning letter whereby the FDA explained that it is unable to adequately evaluate the safety, effectiveness and reliability of Mentor's breast implants.  See March 2019 warning letter, supra.

99.     Had Mentor properly reported the adverse events associated with its breast implants, the FDA would have included those adverse event reports in the MAUDE database.

100.    Defendants violated other federal requirements including the requirements to:

　　　　　j.     establish and maintain a quality system. [21 C.F.R. § 820.5];

　　　　　k.     provide for management responsibility [21 C.F.R. § 820.20];

　　　　　l.     provide for quality audits [21 C.F.R. § 820.22];

　　　　　m.     establish and maintain procedures to control the design of the device in ordered to

-19-

ensure that specified design requirements are met [21 C.F.R. § 820.30];

n.    establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonable be anticipated to have an adverse effect on product quality [21 C.F.R. § 820.70(e)];

o.    Ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use [21 C.F.R. § 820.70(g)];

p.    Establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality [21 C.F.R. § 820.70(h)];

q.    establish and maintain procedures for acceptance activities, including inspections, tests, or other verification activities [21 C.F.R. § 820.80];

r.    identify the "conformance or nonconformance of product with acceptance criteria … throughout manufacturing, packaging, labeling, installation, and servicing of the product to ensure that only product which has passed the required acceptance activities is distributed, used, or installed" [21 C.F.R. § 820.86];

s.    establish and maintain procedures to control product that fails to conform with specified requirements, including the evaluation of non-conforming products [21 C.F.R. § 820.90(a)];

t.    establish and maintain procedures for implementing corrective and preventive action including:

i.    identifying the cause of product nonconformities,

ii.   identifying the actions needed to correct and prevent recurrence of nonconforming product and other quality problems,

-20-

iii.     ensuring that information related to quality problems or nonconforming product is disseminated to hose directly responsible for assuring. [21 C.F.R. § 820.100(a)(1)-(7)].

101.     Defendants manufactured its textured implants, including Plaintiff Beverly Rose's breast implants, in a manner that violated FDA requirements in the following ways:

a.  Defendants negligently manufactured Mentor textured breast implants using a manufacturing process called the imprint technique that involved inadequately controlled texturing which left silicone particles, debris  and fragments from the textured elastomer shell on the implant surface. *See* Webb, Leland H., et al., Textured Breast Implants: A Closer Look at the Surface Debris Under the Microscope, Plastic Surgery (Oakv). 2017;25(3):179-183, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5626211/?fbclid=IwAR3TG6J1sPsKRK5E3kUlK-5mEeuBudOsYHxPYhIO-z6dE7z0we_TvSrwIRU (last visited on September 30, 2020).

b.  This manufacturing process produced *adulterated* implants, including those implanted in Plaintiff Beverly Rose, that had silicone particles, debris and fragments on the implant surface in violation of [21 C.F.R. § 820.70(h)] and 21 U.S.C. § 351.

c.  Mentor manufactured Beverly Rose's breast implants that were in a defective and unreasonably dangerous condition when put to a reasonably anticipated use. They were in fact used in such a manner; and Beverly Rose's injuries are a direct result of such defects as they existed when the implants were sold and implanted in her body.

d.  The presence of silicone particles/contaminants on the surface of breast implants from a flawed manufacturing process is not unique to Mentor. For example, in 2015, a South American breast implant manufacturer (Silimed) lost its ability to market in Europe after an inspection of the manufacturing process found that the surfaces of some devices were contaminated with particles.  *See* Brad Perriello, Sientra plummets on U.K. breast implant halt, Sept. 15, 2015, available at https://www.massdevice.com/sientra-plummets-on-u-k-breast-implant-halt/ (last visited on September 30, 2020).

e.  Mentor's negligent manufacturing and texturing process produces non-conforming implants that contain silicone particles, elastomer debris, fragments, and contaminants which adhere to the implant surface and are not adequately cleaned and removed prior to sale.

f.  Unwanted silicone particles, elastomer debris, fragments, and contaminants are not subject to adequate quality control—making the implants adulterated with foreign silicone particles; refractile and birefringent fragments; residues.

g.  These adulterants and contaminants from the silicone implant manufacturing process become embedded into human breast tissue when implanted.

h.  **Adulterated medical devices (21 U.S.C.§ 351) are not subject to preemption. 21 C.F.R. § 808.1(d)(2)(ii) provides that, generally, § 521(a) of the Federal Food, Drug and Cosmetic Act (Act) does not preempt a state or local requirement prohibiting the manufacture of adulterated or misbranded devices.**

i.  There are no confirmed cases of BIA- ALCL associated with smooth breast implants. Mentor's texturing technique, when an implant is negligently manufactured, produces foreign and adulterated silicone particles/fragments on the implant surface that are recognized as a foreign body that triggers T-cell lymphoma and, over time, ALCL.

102.   Eric Swanson, M.D., a world-renowned cosmetic surgeon, has stated as follows: "Textured implants [including Mentor Siltex] are not just "overrepresented" in cases of ALCL. Brody et. al report no cases of ALCL in women treated solely with smooth implants. Similarly, Clemens reports no confirmed cases of ALCL in patients treated only with smooth implants . . . Brody believes that texturing is the likely trigger, not infection." Evidence-Based Cosmetic Breast Surgery (2017) (emphasis added).

103.   Another board-certified and well-recognized plastic surgeon (Dennis Hammond, M.D.) made the following comment at a conference relating to BIA-ALCL in Rome last year - "Silicone particle induced inflammation is the primary cause of BIA-ALCL." Presentation at 1st World Consensus Conference on BIA-ALCL (Rome Italy, Oct. 5, 2019), available at https://youtu.be/YxPFayQsjUo?t=24447 (slide presented during his presentation, "The Micro-particulate

theory and the role of innate immunity" as part of a scientific panel addressing the etiopathogenesis of BIA-ALCL").

104.   Specifically, Plaintiffs aver that Defendants violated the PMA and federal law and requirements because the PMAs and federal law required Mentor to:

    a.   follow ISO standards (10933-1 and 14607);

    b.   detect, review, and remove impure particles and chemicals;

    c.   remove and dispose of non-conforming implants;

    d.   prevent non-conforming implants and contaminants, fragments, particles, and impurities on the implant from reaching the public;

    e.   comply with PMA post-market reporting obligations;

    f.   not manufacture adulterated implants defined, in part, by 21 U.S.C. § 351(h) as a device where "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable" CGMP requirements;

    g.   follow CGMP requirements, including section 820.70, to "establish and maintain procedures for the use and removal" of manufacturing material that could adversely affect product quality;

    h.   not manufacture contaminated products that could be injurious to health;

    i.   manufacture its implants securely protected from dust, dirt, and as far as may be necessary by all reasonable means, from all foreign or injurious contaminations;

    j.   manufacture implants without any poisonous or deleterious substance which may render the contents injurious to health; and

    k.   disclose the risk that silicone particles, particulates, residues or harmful contaminants from the manufacturing process could remain on the implant surface

-23-

Exhibit A - Page 28

after scrubbing and shipment of the final product.

105.    21 C.F.R. § 808.1(d)(2)(ii) provides that § 521(a) of the FDCA does not preempt a state or local requirement prohibiting the manufacture of adulterated or misbranded devices

106.    These specific allegations of violations of the federal PMAs, laws, regulations, and requirements due to negligent manufacturing in violation of federal law are not subject to federal preemption.[3]

107.    A device not manufactured in accordance with the requirements of the PMAs and in violation of CGMPs and "QSRs, the failure to follow the CGMPs and QSRs provide a basis for liability as violations of federal law that are parallel to state law claims.

108.    Mentor violated the CGMPs and Quality System Regulations ("QSRs") set forth in 28 C.F.R.§ 820 et seq.

109.    Mentor's violations of the PMAs and violations of FDA requirements set forth in the QSRs and CGMPs, specifically, failure of 21 C.F.R. § 820.70(h) requiring the removal of manufacturing material that could reasonably be expected to have an adverse effect on product quality, caused Beverly Rose's BIA-ALCL.

---

[3] See *Gravitt v. Mentor Worldwide*, LLC, 289 F. Supp.3d 877,  (N.D. Ill. 2018) ("The Seventh Circuit [in *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010)] held that because the plaintiff's state law claim "that she was injured by [the defendant's] violations of federal law in manufacturing the device implanted in her hip ... would not impose on defendants any requirement 'different from, or in addition to, any requirement' imposed by federal law," the claim was not preempted. *Id.* at 553 (quoting 21 U.S.C. § 360k(a)(1))."). *See also Money v. Johnson & Johnson*, No. 15-cv-03213-LB, 2016 U.S. Dist. LEXIS 70808, at *9-11 (N.D. Cal. May 31, 2016) (holding such specific allegations of PMA violations are not preempted). *See also Bryant v. Medtronic, Inc.* (In re: Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.), 623 F.3d 1200, 1207 (8th Cir. 2010) (no preemption where plaintiffs alleged defendants "violated a federal requirement specific to the FDA's PMA approval of this Class III device."). *Accord Sumpter v. Allergan Inc.*, No. 4:17-CV-2289 RLW, 2018 U.S. Dist. LEXIS 154467, 2018 WL 4335519, at *2 (E.D. Mo. Sept. 11, 2018); Cf. *Delfino v. Medtronic, Inc.*, No. A18-1462, 2019 Minn. App. Unpub. LEXIS 530 (June 10, 2019) (failing to follow FDA manufacturing and performance standards that paralleled state law claims would not be preempted; however, facts failed to show a violation or departure of federal requirements).

Plaintiffs aver that where, as here, a complaint alleges both that a device was not manufactured in accordance with the requirements of the PMAs and in violation of the CGMPs and QSRs, the failure to follow the CGMPs and QSRs also provide a basis for liability as violations of federal law that are parallel state law claims. *See Warren v. Howmedica Osteonics Corp.*, No. 4:10 CV 1346 DDN, 2011 U.S. Dist. LEXIS 32643, 2011 WL 1226975, at *9 n.2 (E.D. Mo. Mar. 29, 2011). In addition — because Plaintiffs allege the implants were "adulterated" by foreign, decomposed and injurious unwanted silicone particles — federal law specifically incorporates CGMPs. 21 U.S.C. § 351.

---

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A - Page 29

110.     Plaintiffs' claims are governed by multiple theories of the CPLA, none of which are preempted as they pertain to manufacturing defects.  See Simoneau v. Stryker Corp., 3:13-CV-1200 JCH, 2014 WL 1289426, at *3-6 (D. Conn. Mar. 31, 2014) (plaintiff's CPLA claim for manufacturing defect of a hip implant survives because "manufacturing residuals" left on the implant during manufacture was a violation of federal requirements which runs parallel to the state requirements and is not preempted).

111.     But for the Defendants' failure to comply with the above requirements, as well as their clearly-established post-market surveillance obligations, Mrs. Rose would have decided against implantation and her injuries would not have occurred.

112.     Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor had a duty to exercise reasonable care in adequately warning Plaintiff and/or Plaintiff's implanting physician about the dangers of Mentor's Breast Implants, and about all adverse events of which Mentor became aware, and had a post-market duty to identify, monitor and report all adverse events and all risks associated with the product.

113.     Despite having knowledge and possession of evidence showing that the use of Mentor Breast Implants was dangerous and likely to place consumers' health at serious risk, as will be detailed further below, Mentor refused or recklessly failed to identify, disclose and warn of the health hazards and risks associated with the product, and about all adverse events which were known to Mentor.

114.     Instead, Defendants marketed, advertised and promoted the product as safe and effective while at the same time consciously refusing and/or recklessly failing to monitor, warn, or otherwise ensure the safety and efficacy for users of Mentor Breast Implants.

115.     Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor had a duty to revise its product labeling after becoming aware of otherwise undisclosed dangers in Mentor Breast Implants. Mentor refused or recklessly failed to do so.

///

COMPLAINT AND DEMAND FOR JURY TRIAL    Exhibit A - Page 30

116.    Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor was required at all material times to promptly report any information suggesting that one of its products may have contributed to a serious injury, or had malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

117.    The FDA publishes the adverse events in a public, searchable Internet database called the Manufacturer and User Device Experience, or "MAUDE," and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

118.    In 2011, the FDA granted an exemption to Mentor for submitting the required adverse event reports related to silicone gel-filled implants by instead submitting post-market spreadsheet reports (PSR) or alternative summary reports (ASR) for "well-known" or expected injuries or malfunctions. See FDA Update on the Safety of Silicone Gel-Filled Breast Implants (June 2011) (available at https://www.fda.gov/downloads/medicaldevices/productsandmedicalprocedures/implantsandprosthetics/breastimplants/ucm260090.pdf (last visited on September 30, 2020). See also 21 C.F.R. §§ 803, 803.19.

119.    The summary reporting did not apply to reportable death or serious injury events which still had to be reported to the FDA within 30 days. See 21 C.F.R. § 803.50. If the FDA finds that a manufacturer has failed to comply with the reporting requirements, they may revoke the manufacturer's summary reporting exemption. Id. at §§ 803.19(d), 803.52.

120.    Plaintiffs have reason to believe that the FDA has revoked Mentor's summary reporting exemption for violating its summary reporting requirements. Over the last two years, the number of adverse event reports pertaining to breast implants has increased exponentially.

121.    As of July 18, 2018, the FDA had received 39,406 adverse event reports for breast implants. See id. 36 percent of those reports were submitted in the last two years alone. See id. Thus, Plaintiffs believe that in July 2017, the FDA rescinded Mentor's privilege to file its adverse events

through PSR reports for violation of its reporting requirements hence the enormous uptick in MDR reports filed. In the first seven months of 2018, the number of searchable MDRs grew from 5,158 to 9,019. See id.

122.    Some courts have held that adverse event reports are appropriate to show that a defendant manufacturer was on notice of potential serious injuries. See In Re Tylenol Marketing, Sales Practices and Products Liab. Lit., 181 F. Supp. 3d 278, 285–86 (E.D. Pa. 2016) ("The extent to which the defendants were on notice of the potentially adverse effects of Tylenol would be relevant to showing how intentional their behavior was in not addressing a potential problem or safety signal").

123.    Here, the adverse event reports would be evidence of Mentor's pre-2011 knowledge of BIA-ALCL. See In re Gadolinium–Based Contrast Agents Products Liability, 956 F. Supp. 2d 809, 814-15 (N.D. Ohio Jul. 25, 2013) (finding that adverse event reports represent "a safety signal . . . once a safety signal has been identified, the drug manufacturer must take affirmative steps to investigate").

124.    As summary reports are not publicly accessible through the MAUDE database, they can only be accessed through a Freedom of Information Act ("FOIA") request to the FDA. Mentor's failures in truthful reporting has led to the concealment of adverse event rates of BIA-ALCL and other serious injuries from Mrs. Rose, her implanting plastic surgeon, and the general public.

125.    Defendants' insufficient follow-up rates and inadequate data, as detailed above, establish and confirm Defendants' reckless and intentional disregard for the safety of thousands of women.

126.    Each of the above-cited deficiencies in Defendants' post-market compliance, including those described above, was a "failure to comply with the conditions of approval" and each constituted a ground for withdrawal of the PMA. Defendants' conduct separately violated their duties under the law.

127.    Notwithstanding Defendants' failures to comply with post-approval requirements, including the failures described above, Defendants continued to commercially distribute the Mentor® Breast Implants. As expressly provided in the PMA, such distribution was a violation of federal law.

///

-27-

128.    Had Defendants substantially complied with the PMA, rather than flagrantly under-performing the post-approval requirements as alleged above, Mentor's disclosures would have led to much wider knowledge of the risk of BIA-ALCL associated with Mentor Breast Implants.

129.    Had Defendants substantially complied with the PMA, rather than flagrantly under-performing the post-approval requirements as alleged above, Plaintiff's plastic surgeon, Dr. Niccole would have learned of the risk of BIA-ALCL associated with Mentor Breast Implants and would have advised Plaintiff Beverly Rose to purchase a safer product.

130.    To protect the Mentor brand, the Defendants intentionally failed in their post-approval study and conditions of approval, and thereby consciously and deliberately concealed its knowledge of known safety risks from the FDA, the medical community, and the public at large.  Additionally, the Defendants ignored the available scientific studies and publications indicating an association between textured breast implants and ALCL.

131.    At material times, Defendants routinely maintained manufacturing facilities that failed to comply with applicable law and regulations in relation to:

132.    The lack of approved software and systems;

   a.   The use of nonconforming products;

   b.   Documents which failed to include data or statistical rationale to support sampling plans used to test saline and gel-filled products;

   c.   The failure to initiate or take corrective action to reassess the results and adjust the values of product bioburden samples;

   d.   The omission of any reference in Defendants' reporting to its manufacturing processes as a potential cause of product failures relating to the inability to sterilize the product;

   e.   Deficiencies in Defendants' sampling methods for finished product testing;

   f.   Deficiencies in Defendants' risk analyses and its investigation of non-conformances;

   g.   Deficiencies in Defendants' environmental monitoring control procedures; and

-28-

COMPLAINT AND DEMAND FOR JURY TRIAL

> h. Citations to incomplete data and missing statistical or technical rationales to justify the performance of finished product testing.

133. These deviations contributed to the faulty manufacture of Mentor Breast Implants which were defective and adulterated.

134. Mentor failed to warn consumers, healthcare providers, the general public, and the FDA that ALCL or BIA-ALCL, and symptomatology attenuated thereto, was a potential risk of Mentor Breast Implants, and that hundreds, if not thousands, of patients had suffered negative experiences and events as a result of such known risk.

135. The accurate risk estimate of developing ALCL or BIA-ALCL was not disclosed in the product's consumer labeling.

136. Mentor knew of its manufacturing failures and nonetheless continued to manufacture and sell its adulterated breast implants to the determent of others, including Plaintiff Beverly Rose.

137. Defendants' conduct violated its federal regulatory duties and its duties under state law. Defendant withheld imperative safety information from Plaintiff Beverly Rose. Because Defendants failed to timely, completely, or report their knowledge of the accurate risk estimate and complications associated with Mentor Breast Implants, the public's knowledge of the risks associated with Mentor Breast Implants were seriously hampered and delayed. This endangered patient safety, including the safety of Plaintiff Beverly Rose.

**Breast Implant-Associated Anaplastic Large-Cell Lymphoma**

138. Approximately 300,000 total breast implants are placed per year in the U.S. From 2000 to 2016, the number of breast augmentations in the United States rose 37 percent, and reconstructions after mastectomy rose 39 percent.

139. BIA-ALCL is a rare T-cell lymphoma that can develop following breast implants. It is a type of non-Hodgkin's lymphoma, a cancer of the cells of the immune system.

///

///

-29-

140.    The most common presenting symptom for BIA-ALCL is a swollen breast caused by the formation of a delayed unilateral idiopathic seroma occurring between the implant surface and the breast capsule.

141.    Upon information and belief, the first case of ALCL in association with silicone breast implants was diagnosed in the early 1990's.

142.    In November 2008, the Journal of the American Medical Association ("JAMA") published a retroactive analysis of 11 cases of ALCL between 1994 and 2006, and based upon preliminary findings, concluded that the evidence indicated an association between silicone breast prosthesis and ALCL.

143.    In 2011, a summary of published studies, evidence and reports was published that identified 27 cases of ALCL, and concluded that there was an association between breast implants and ALCL.

144.    In July 2014, the United Kingdom's Medicines and Healthcare Products Regulatory Agency ("MHRA") issued a Medical Device Alert "to further encourage healthcare professionals to report cases of ALCL in women who have breast implants or who have had them removed."

145.    In March 2015, an analysis identified 173 cases of ALCL.  That same month, the French National Cancer Institute announced, "There is a clearly established link between the occurrence of this disease and the presence of a breast implant."

146.    On May 19, 2016, the World Health Organization ("WHO") gave the disease an official designation as "BIA-ALCL" and classified it as a distinct clinical entity, separate from other categories of ALCL.

147.    In November 2016, Australia's Therapeutic Goods Administration ("TGA") convened an expert advisory panel to discuss the association between breast implants and ALCL and provide ongoing advice.

148.    On March 21, 2017, the FDA released a safety communication updating the current understanding of BIA-ALCL.

149.    In the Updated Safety Alert, the FDA recognized the WHO's designation that BIA-ALCL can occur after receiving breast implants and stated that "[a]t this, time, most data suggest that BIA-ALCL occurs more frequently following implantation of breast implants with textured surfaces rather than those with smooth surfaces."

150.    In May 2017, a global analysis of 40 governmental databases identified 363 cases of BIA-ALCL with 258 being reported to the FDA.

151.    A July 2017 article stated that "[e]xperts have called for a common type of breast implant to be banned after it was revealed two people died and 23 developed the same type of cancer in the UK following breast enlargement surgery." Katie Forster, Calls to ban textured breast implants after two die and 23 develop same type of cancer, The Independent Online, July 10, 2017, available at https://www.independent.co.uk/news/health/breast-implants-cancer-ban-two-die-23-develop-same-type-textured-common-women-enlargement-cosmetic-a7832996.html (last visited on September 30, 2020).

152.    A September 2017 update from the FDA reported that the agency had received a total of 414 MDRs related to breast implants and ALCL, including 9 deaths.

153.    A recent JAMA Oncology article concluded that "[b]reast implants are associated with increased risk of breast-ALCL", but the absolute risk has not been determined. Mintsje de Boer, et al., Breast Implants and the Risk of Anaplastic Large-Cell Lymphoma in the Breast. JAMA Oncol. (published January 4, 2018).

154.    On May 9, 2018, Australia's TGA reported 72 cases of ALCL in Australian patients.

155.    The natural occurrence of this cancer is 1 in 300,000. However, FDA recently cited to studies that place the estimated current risk of BIA-ALCL in women with textured implants to be between 1 in 3,817 and 1 in 30,000. This is consistent with risks reported in Europe. A December 2016 update from the TGA had reported a risk of 1 in 1,000 to 1 in 10,000 for textured implants.

156.    In March 2019, FDA convened a General and Plastic Surgery Devices Advisory Panel ("Panel") to discuss the long-term benefits and risks of breast implants.

157.    The meeting covered a range of topics on breast implant safety, including characterization of BIA-ALCL incidence and risk factors.

158.    The Panel recommended, among other things, that FDA require a boxed warning in breast implant labeling and a standardized checklist as part of the informed consent process and provide greater transparency regarding materials present in breast implants.

159.    In a July 24, 2019 announcement recalling certain breast implant products, the FDA acknowledged 573 cases of BIA-ALCL worldwide and reported "33 patient deaths", a "significant increase" (116 new cases and 24 more deaths) since an update by the FDA in February 2019.

160.    On October 24, 2019, the FDA released a Draft Guidance document (Breast Implants – Certain Labeling Recommendations to Improve Patient Communication (Draft Guidance)) ("Draft Guidance") recommending that breast implant manufacturers, including Defendants, add a "boxed warning" on the labeling materials of breast implants. See https://www.fda.gov/regulatory-information/search-fda-guidance-documents/breast-implants-certain-labeling-recommendations-improve-patient-communication (last visited on September 30, 2020).

161.    The Draft Guidance specifically states that "FDA believes that a boxed warning should be part of physician and patient labeling materials for breast implants" to ensure that patients are warned that breast implants "have been associated with the development of a cancer of the immune system called breast implant-associated anaplastic large cell lymphoma (BIA-ALCL)". See id. at 7, 12.  The draft boxed warning and checklist suggested by FDA note that "[s]ome patients have died from BIA-ALCL." See id. at 12.

162.    The FDA acknowledged that the currently approved labeling for breast implants are lengthy, "in excess of fifty pages" and that patients "may not be receiving or understanding important information regarding the benefits and risks of breast implants." See id. at 6.

163.    In addition to the boxed warning recommendation, the FDA also recommended the use of a patient decision checklist and inclusion of a list of chemical and heavy metal ingredients found in breast implants to ensure patients are fully informed of the risks of their breast implants.  See id. at 8, 13.

-32-

164.    The FDA explained, to ensure patients have information of the risks, especially the risk of BIA-ALCL, "a boxed warning, a patient decision checklist, and a patient information booklet/brochure . . . should be provided by manufacturers and given to patients prior to implantation." See id. at 6 [emphasis added].

165.    The FDA further reminded manufacturers that:

166.    a device shall be deemed misbranded if, among other things: its labeling is false or misleading; its label does not contain adequate warnings; or any information required to be in the labeling is not prominently placed with such conspicuousness and in such terms to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use (see sections 502(a), 201(n), 502(c), and 502(f)(2) of the Federal Food, Drug and Cosmetic Act (FD&C Act)).

167.    See id. at 7 [footnote omitted].

168.    The FDA also recommended patients be given current incident rates of BIA-ALCL in the patient checklist, acknowledging FDA's stance that incidence rates are crucial to an adequate warning. See id. at 8.

169.    According to the American Society of Plastic Surgeons (ASPS), there were approximately 309 both suspected and confirmed cases of ALCL in the United States, and a total of 809 worldwide as of October 25, 2019.  See https://www.plasticsurgery.org/for-medical-professionals/health-policy/bia-alcl-physician-resources (last visited on September 30, 2020).

170.    On November 15, 2019, in the Aesthetic Surgery Journal, an article entitled Commentary on: Comparative Analysis of Cytokines of Tumor Cell Lines, Malignant and Benign Effusions Around Breast Implants, by Mark R. Magnusson, MBBS, FRACS, it was reported that "around 800 recognized cases [of BIA-ALCL] have been reported worldwide and the incidence appears to be increasing." Mark R. Magnusson, Commentary on: Comparative Analysis of Cytokines of Tumor Cell Lines, Malignant and Benign Effusions Around Breast Implants. Aesthetic Surgery Journal (November 2019).

///

-33-

COMPLAINT AND DEMAND FOR JURY TRIAL

171.    Upon information and belief, BIA-ALCL is only associated with textured breast implants.

172.    The difference between textured implants and smooth implants is significant:



173.    Despite Defendants' knowledge of an association between breast implants and ALCL dating back to the 1990's, Defendants purposefully failed to comply with their clearly-established post-market surveillance obligations and in doing so have exposed many hundreds of thousands of women to the risk of a life-altering and avoidable cancer.

174.    To date, dozens of countries around the world have banned textured breast implants due to their risk of BIA-ALCL and new bans are being imposed frequently.

175.    Some of those countries that have not banned textured implants have recommended the use of smooth surface over textured.

## FACTS SPECIFIC TO BEVERLY ROSE

176.    In 1985, Plaintiff BEVERLY ROSE was implanted with MENTOR MemoryGel textured breast implants.  The implanting surgeon was Defendant MICHAEL NICCOLE, M.D.

177.    At the time the Mentor implants were placed into Mrs. Rose's body, she was not advised, nor did she have any independent knowledge, that the Implants were anything other than safe, life-long products. Nor was she advised that the Implants were associated with and/or known to cause ALCL.

178.    Mrs. Rose's plastic surgeon, Michael Niccole, M.D., did not warn Mrs. Rose about the risk of BIA-ALCL with use of the Breast Implants.

179.    Thus, Mrs. Rose was not advised, and had no independent knowledge until her removal surgery, that:

    a.  A risk of BIA-ALCL existed; or

    b.  A risk of death attributable to BIA-ALCL existed; or

    c.  She might need future imaging and/or diagnostic procedures to identify, or evaluate ALCL and/or BIA-ALCL; or

    d.  She might need future surgery or cancer treatments if she contracts ALCL and/or BIA-ALCL.

180.    Defendants were aware of the defects in the Mentor® Breast Implants before Mrs. Rose's implantation procedure, and the potential for development of BIA-ALCL but did not respond in accordance with their obligations.

181.    If Mrs. Rose had been advised that implantation was associated with even the slightest risk of developing ALCL and/or BIA-ALCL she would not have proceeded with implantation of the Implants.

Exhibit A - Page 40

182.    On or about April 28, 2016, Plaintiff was diagnosed with metastases anaplastic large T-cell lymphoma stage III B (Non-Hodgkin's lymphoma) with lymphadenopathy in her chest, abdomen and an enlarged spleen.

183.    Plaintiff received six (6) cycles/rounds of R-CHOP (chemotherapy) at Kaiser Permanente Anaheim Kramer Medical Offices in Anaheim, California.

184.    Plaintiff thereafter underwent stem cell transplantation in October 2016 for her Stage III B distant metastases Non-Hodgkin's.

185.    On November 4, 2019, Plaintiff underwent exploration of bilateral breast and full spherical capsulectomies at Center for Special Surgery located in Newport Beach, California. Plaintiff went through a removal surgery to "try to ensure that the ALCL did not originate in her breasts." It was only at that surgery it was discovered there was a lot of silicone gelatinous oil in and throughout the breast tissue and breasts bilaterally.

186.    Prior to her development, diagnosis and treatment of ALCL, Mrs. Rose enjoyed an active, full life, and did not experience the symptoms which arose after the Mentor® Breast Implants were placed in her body.

187.    Defendant Mentor, through its misrepresentations and omissions including its refusals or reckless failures to disclose or report defects and significant events as required by federal law, and by state law which does not impose duties or requirements materially different from those imposed by federal law, concealed from Plaintiff and her healthcare providers the risk of BIA-ALCL associated with its Breast Implants.

188.    All conditions precedent to filing this action have occurred, or have been satisfied or waived.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

189.    Plaintiffs hereby incorporate by reference all other paragraphs in this Complaint as if set forth fully herein.

///

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A - Page 41

190.     The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and other consumers the true risks associated with Mentor® Breast Implants.

191.     As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that she had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

192.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Mentor® Breast Implants. Defendants were under a duty to disclose the true character, quality and nature of the Products because this was non-public information over which they continue to have exclusive control. Defendants knew that this information was not available to Plaintiff Mrs. Rose, her medical providers and/or her health facilities, yet they failed to disclose the information to the public.

193.     Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.

194.     Plaintiff, consumers, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

## FIRST CAUSE OF ACTION

### (Strict Product Liability-Failure to Warn)

### Against All Defendants

195.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

196.     At all times pertinent hereto, Defendants directly or through their agents, apparent agents, servants or employees designed, manufactured, tested, marketed, and commercially distributed its

Silicone Textured Breast Implants to clinics, hospitals and plastic surgeons, who ultimately operated and implanted them in consumers' bodies.

197.    Defendants directly or through their agents, apparent agents, servants or employees designed, manufactured, tested, marketed, and commercially distributed the Silicone Textured Breast Implants implanted into Plaintiff's body.

198.    The Silicone Textured Breast Implants that were implanted into Plaintiff were defective and unreasonably dangerous when they left the possession of the Defendants in that:

a) The Silicone Textured Breast Implants contained insufficient warnings to alert consumers and their prescribing physicians that the Silicone Textured Breast Implants posed an unreasonably high risk of causing BIA-ALCL once implanted;

b) Defendants' promotional materials, labeling and instructional materials that accompanied the Silicone Textured Breast Implants were inadequate and misleading to consumers and their prescribing physicians;

c) Even after Defendants internally knew and had received notice from reputable medical sources, prior to the sale of the device to the Plaintiff, that the device presented an inordinately high risk of causing BIA-ALCL and harm to the consumer, Defendants knowingly and deliberately failed under 21 C.F.R. 814.39(d) to:

warn the public, including Plaintiff and her physician, of the serious risk that their product poses in the development of BIA-ALCL;

i.    exercise their ability to unilaterally modify their product labeling to add or strengthen warnings concerning the serious risk of causing BIA-ALCL;

ii.   exercise their ability to unilaterally modify their product labeling to provide warnings or instructions that are intended to enhance the

-38-

Exhibit A - Page 43

safe use of the device with respect to mitigating the risk of causing BIA-ALCL; and

iii.   exercise their ability to unilaterally modify their product labeling to delete misleading, false, and unsupported indications regarding Silicone Textured Breast Implants' causal relationship with BIA-ALCL.

d)   The Silicone Textured Breast Implants did not conform to the representations made by Defendants concerning the risk of BIA-ALCL; and

e)   Defendants' representations concerning the Silicone Textured Breast Implants did not conform to applicable federal laws and regulations.

199.    Such warnings, if given, would have caused such physicians and patients to be informed when selecting the appropriate breast implant and would have enabled patients, including Plaintiff, to avoid the risks of developing BIA-ALCL.

200.    At all relevant times, under federal law and regulation, Defendants were under a continuing duty to monitor the product after premarket approval, and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences or AERs of which it became aware and that are, or may be, attributable to the product.

201.    Defendants failed to submit appropriate medical device reports to inform the FDA of the danger of developing BIA-ALCL in connection with the Silicone Textured Breast Implants, as required by 21 C.F.R. § 803.50, even though they should have been aware of such adverse incidents and were actually aware of such incidents, including at least 22 events of BIA-ALCL Defendants had received between 2007-2010.

202.    MENTOR failed to fulfill its duty to report to the FDA per 21 C.F.R. § 803.50, and warn physicians or patients—including Plaintiff—implanted with MENTOR's Silicone Textured Breast Implants of the dangers of BIA-ALCL.

203.    In addition, MENTOR failed to:

-39-

a) Investigate and evaluate complaints of BIA-ALCL per 21 C.F.R. §§ 820.198 and 803.18(e) and prepare corresponding medical device reports;

b) Timely submit reports of BIA-ALCL per 21 C.F.R. § 803.50(a) and instead attempted to transmit such reports years after first receiving notice of the event;

c) Provide all information reasonably known to it per 21 C.F.R. § 803.50(b) in its reports of BIA-ALCL but rather simply regurgitated its misleading and deficient labeling; and

d) Use the appropriate device problem code for reports of BIA-ALCL per 21 C.F.R. § 803.52 but instead represented there was "no apparent adverse event."

204.    Defendants, as developers and manufacturers of the Silicone Textured Breast Implants, are held to the level of knowledge of experts in the field of that type of breast implant, and had a duty to warn its consumers and prescribing physicians of the dangers associated with the implants and failed to do so.

205.    At the time Plaintiff's physician implanted the Silicone Textured Breast Implants, her physician did not have substantially the same knowledge as the Defendants about the unreasonably high risks of causing BIA-ALCL because the Defendants failed to provide adequate warnings of those risks.

206.    As the direct and proximate result of Defendants' failure to warn of the defective condition of the Silicone Textured Breast Implants, the Plaintiff was implanted with Silicone Textured Breast Implants and suffered, or will suffer, painful removal procedures to mitigate the risk of developing BIA-ALCL, as well as any treatment, therapy, recovery, and expense associated with the removal of the Silicone Textured Breast Implants, the potential for the development of BIA-ALCL, and any condition or symptoms associated with BIA-ALCL or the prevention of that issue.

207.    As a further proximate result of Defendants' failure to warn of the defective condition of the Silicone Textured Breast Implants, Plaintiff suffered debilitating physical pain and mental suffering, was/will be required to undergo additional surgeries and other procedures, incurred substantial hospital, medical, nursing and pharmaceutical expenses therefrom; suffered emotional distress, anxiety,

depression and disability; loss of earnings; and loss of quality of life, and all of these injuries are permanent and continuing.

208.    The FDCA contains an express preemption provision, 21 U.S.C. 360k(a), which as relevant, states: "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-- (1) which is different from, or in addition to, any requirement applicable under this Act to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act."

209.    This cause of action is based on the Defendants' postmarket violations of federal safety statutes and regulations.

210.    Moreover, Plaintiff does not bring the underlying action as an implied statutory cause of action but rather she is pursuing parallel state common law claims based upon Defendants' violations of the applicable federal statutes and regulations.

211.    Plaintiff's strict product liability for failing to warn claim is, thus, not preempted by Section 360k(a), because the violations alleged are all based on federal statutory and regulatory standards which includes no "requirement which is different from, or in addition to, any requirement applicable under" the FDCA and regulations promulgated thereunder. As such, the claims set forth in this cause of action contain requirements that are parallel to the FDCA and regulations promulgated thereunder.

### SECOND CAUSE OF ACTION

#### (Strict Product Liability-Manufacturing Defect)

#### Against All Defendants

212.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

213.    At all times material hereto, Defendants, directly or indirectly, created, manufactured, assembled, designed, sterilized, tested, packaged, labeled, marketed, promoted, advertised, sold and/or

distributed into the stream of commerce Silicone Textured Breast Implants, including the Silicone Textured Breast Implants implanted into Plaintiff.

214.    Defendants directly or through their agents, apparent agents, servants or employees designed, manufactured, tested, marketed, and commercially distributed the Silicone Textured Breast Implants implanted into Plaintiff's body.

215.    The Silicone Textured Breast Implants that were implanted into Plaintiff were defective and unreasonably dangerous when they left the possession of the Defendants in one or more of the following ways:

a)   manufacturing and selling Silicone Textured Breast Implants that differ from the specifications set forth in the PMA, its Supplements, the Conditions of Approval, and/or other federal regulations;

b)   manufacturing and selling Silicone Textured Breast Implants with nonconforming materials and uncertified components, inconsistent with the specifications set forth in the PMA, its Supplements, the Conditions of Approval, or other federal regulations;

c)   manufacturing, distributing, and selling Silicone Textured Breast Implants knowing, or while capable of knowing, that they created an unreasonably high risk of causing BIA-ALCL when implanted into patients, including the Plaintiff;

d)   incorporating components into Silicone Textured Breast Implants that could not stand up to normal usage;

e)   failing or refusing to properly meet the applicable standard of care by not complying with applicable federal laws and regulations in manufacturing, marketing, selling, and distributing the Silicone Textured Breast Implants;

f)   failing or refusing to include adequate warnings with the device that would alert Plaintiff and her prescribing physician to the potential risks and serious side effects of the Silicone Textured Breast Implants;

Exhibit A - Page 47

g)  failing or refusing to exercise reasonable care in its inspecting and testing of the Silicone Textured Breast Implants both before and after they were placed on the market which, if properly performed, would have shown that the device caused serious side effects, including BIA-ALCL;

h)  failing or refusing to warn, or adequately warn, the Plaintiff or her prescribing physicians that the Silicone Textured Breast Implants created a higher risk of causing BIA-ALCL than other similar textured implants currently on the market;

i)  failing or refusing to provide adequate post marketing warnings or instructions to the Plaintiff and her prescribing physicians of the significant risk of causing BIA-ALCL;

j)  failing or refusing to exercise reasonable care in its manufacturing and quality control processes;

k)  placing an unsafe and defective breast implant into the stream of commerce; and

l)  underplaying the significant risks posed by the Silicone Textured Breast Implants to the public, including the Plaintiff and her prescribing physicians in order to make a profit from sale of the device.

216.    Such measures, if implemented, would have mitigated or eliminated the risk posed by silicone particles shredding from the Silicone Textured Breast Implants and would have enabled patients, including Plaintiff, to avoid the risks of developing BIA-ALCL.

217.    At all relevant times, under federal law and regulation, Defendants were also required to comply with the FDA's Quality System Regulations and Current Good Manufacturing Practices under 21 C.F.R. Part 820, which, among other things, requires that each manufacturer put procedures in place to test products for compliance with product specifications, document and check compliance with product specifications before products are accepted for sale and use, and identify and control all products that fail to conform with product specifications.

///

218.    It was the duty of the Defendants to comply with the FDCA, and the regulations promulgated pursuant to it. Yet, notwithstanding this duty, Defendants violated the FDCA and regulations in one or more of the following ways:

a)   introducing or delivering for introduction into interstate commerce a device that was adulterated (21 U.S.C. §§ 331, 351(h) and 21 C.F.R. Part 820);

b)   receiving in interstate commerce a device that was adulterated and delivering the device for pay or otherwise (21 U.S.C. §§ 331, 351(h) and 21 C.F.R. Part 820);

c)   manufacturing a device that was adulterated (21 U.S.C. §§ 331, 351(h) and 21 C.F.R. Part 820);

d)   failing to establish and maintain procedures for validating the device design of Silicone Textured Breast Implants to ensure that the implants conformed to patients' needs and intended uses, including failing to test production units under actual or simulated use conditions (21 C.F.R. §820.30);

e)   failing to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements, including evaluating and selecting potential suppliers, contractors, and consultants on the basis of their ability to meet quality requirements; defining the type and extent of control to be exercised over the product, services, suppliers, contractors, and consultants, based on the evaluation results; and establishing and maintaining records of acceptable suppliers, contractors, and consultants (21 C.F.R. §820.50);

f)   failing to develop, conduct, control, and monitor production processes to ensure that the Silicone Textured Breast Implants conformed to their specifications, as well as maintaining process controls to ensure conformance to specifications. This includes, but is not limited to, ensuring that the any Silicone Textured Breast Implants did not exceed the maximum allowable roughness (21 C.F.R. §820.70(a));

g) failing to establish and maintain procedures with respect to its lost-salt process of texturizing for the use and removal of such manufacturing materials to ensure that the amount of silicone particles embedded on the implant due to this texturizing process is limited to an amount that does not adversely affect the device's quality (21 C.F.R. §820.70(h));

h) failing to establish and maintain procedures to control texturized implants that do not conform to specification, including failing to adequately identify, document, evaluate, segregate, and dispose of nonconforming implants (21 C.F.R. §820.90(a));

i) failing to establish and maintain procedures for implementing corrective and preventive action in order to properly detect recurring quality problems related to the lost-salt process, investigate causes of nonconformities, identifying necessary action to correct and prevent recurrence of nonconforming implants, implementing changes in methods to correct such quality problems, and validating the corrective and preventive action (21 C.F.R. §820.100(a));

j) failing to establish procedures for quality audits to determine the effectiveness of the quality system and to ensure corrective action related to Silicone Textured Breast Implants be taken as necessary (21 C.F.R. §820.22);

k) failing to adequately inspect, test, and validate Silicone Textured Breast Implants after completion of assembly and immediately before delivery for implantation into consumers, like Plaintiff, to mitigate the development of bacterial accumulation and other risks which cause BIA-ALCL (21 C.F.R. §820.160); and

l) failing to monitor, receive, review, and evaluate and/or investigate complaints received from breast implant patients and their physicians, failing to timely identifying any problems with one of its devices and, failing to take appropriate corrective actions to ensure consumer safety (21 C.F.R. § 820.198).

219.   Because Defendants failed to follow specifications, regulations, and required good manufacturing practices, Plaintiff's Silicone Textured Breast Implants were at a heightened risk of causing the development of BIA-ALCL.

220.   Upon information and belief, Defendants had the technological capability to manufacture Silicone Textured Breast Implants in a reasonably safe manner and is held to the level of knowledge of an expert in the field.

221.   As the direct and proximate result of Defendant's acts and omissions concerning the Silicone Textured Breast Implants, the Plaintiff was implanted with Silicone Textured Breast Implants and suffered, or will suffer, painful removal procedures to mitigate the risk of developing BIA-ALCL, as well as any treatment, therapy, recovery, and expense associated with the removal of the Silicone Textured Breast Implants, the potential for the development of BIA-ALCL, and any condition or symptoms associated with BIA-ALCL or the prevention of that issue.

222.   As a further proximate result of Defendant's acts and omissions concerning the Silicone Textured Breast Implants, Plaintiff suffered debilitating physical pain and mental suffering, was/will be required to undergo additional surgeries and other procedures, incurred substantial hospital, medical, nursing and pharmaceutical expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of earnings; and loss of quality of life, and all of these injuries are permanent and continuing.

223.   The FDCA contains an express preemption provision, 21 U.S.C. 360k(a), which as relevant, states: "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-- (1) which is different from, or in addition to, any requirement applicable under this Act to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act."

224.   This cause of action is based on the Defendants' postmarket violations of federal safety statutes and regulations.

225.     Moreover, Plaintiff does not bring the underlying action as an implied statutory cause of action but rather she is pursuing parallel state common law claims based upon Defendants' violations of the applicable federal statutes and regulations.

226.     Plaintiff's manufacturing defect claim is, thus, not preempted by Section 360k(a), because the violations alleged are all based on federal statutory and regulatory standards which includes no "requirement which is different from, or in addition to, any requirement applicable under" the FDCA and regulations promulgated thereunder. As such, the claims set forth in this cause of action contain requirements that are parallel to the FDCA and regulations promulgated thereunder.

## THIRD CAUSE OF ACTION

### (Negligence)

### Against All Defendants

227.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

228.     At all times pertinent hereto, Defendants directly or through their agents, apparent agents, servants or employees designed, manufactured, tested, marketed, and commercially distributed its Silicone Textured Breast Implants to clinics, hospitals and plastic surgeons, who ultimately operated and implanted them in consumers' bodies.

229.     Defendants directly or through their agents, apparent agents, servants or employees designed, manufactured, tested, marketed, and commercially distributed the Silicone Textured Breast Implants implanted into Plaintiff's body.

230.     The Silicone Textured Breast Implants that were implanted into Plaintiff were defective and unreasonably dangerous when they left the possession of the Defendants in that the Silicone Textured Breast Implants did not conform to applicable federal laws and regulations.

231.     At all relevant times, Defendants violated the FDA's Quality System Regulations and Current Good Manufacturing Practices under 21 C.F.R. Part 820, because MENTOR produced adulterated Silicone Textured Breast Implants that had numerous unwanted particles and solid fragments

-47-

of silicone on the implant surface in violation of CGMP regulations designed to ensure device quality and patient safety.

232.     Such measures, if implemented, would have caused mitigated or eliminated the risk posed by silicone particles shredding from the Silicone Textured Breast Implants and would have enabled patients, including Plaintiff, to avoid the risks of developing BIA-ALCL.

233.     Defendants also violated the above described post-market reporting requirements under 21 C.F.R. Part 803 for the Silicone Textured Breast Implants.  As a result, Defendants negligently failed to adequately warn of the dangers of BIA-ALCL, and test its product before Plaintiff was implanted with MENTOR's Silicone Textured Breast Implants.

234.     Such warnings, if given, would have enabled the FDA, as well as the medical and scientific community, to ensure physicians and patients were adequately informed when selecting the appropriate breast implant and would have enabled patients, including Plaintiff, to avoid being exposed to BIA-ALCL.

235.     Plaintiff was implanted with Silicone Textured Breast Implants without adequate warning and with manufacturing defects, in violation of the general regulatory requirements, resulting in serious injury to Plaintiff. The injuries Plaintiff suffered are expected to have resulted from such defects. Plaintiff and her physician were unaware that the Silicone Textured Breast Implants were defective at the time of implant and thereafter.

236.     As the direct and proximate result of Defendant's negligent acts and omissions concerning the Silicone Textured Breast Implants, the Plaintiff was implanted with Silicone Textured Breast Implants and suffered, or will suffer, painful removal procedures to mitigate the risk of developing BIA-ALCL, as well as any treatment, therapy, recovery, and expense associated with the removal of the Silicone Textured Breast Implants, the potential for the development of BIA-ALCL, and any condition or symptoms associated with BIA-ALCL or the prevention of that issue.

237.     As a further proximate result of Defendant's negligent acts and omissions concerning the Silicone Textured Breast Implants, Plaintiff suffered debilitating physical pain and mental suffering,

was/will be required to undergo additional surgeries and other procedures, incurred substantial hospital, medical, nursing and pharmaceutical expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of earnings; and loss of quality of life, and all of these injuries are permanent and continuing.

238.    The FDCA contains an express preemption provision, 21 U.S.C. § 360k(a), which as relevant, states: "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-- (1) which is different from, or in addition to, any requirement applicable under this Act to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act."

239.    This cause of action is based on the Defendants' postmarket violations of federal safety statutes and regulations.

240.    Moreover, Plaintiff does not bring the underlying action as an implied statutory cause of action but rather she is pursuing parallel state common law claims based upon Defendants' violations of the applicable federal statutes and regulations.

241.    Under California's doctrine of negligence per se, failure to exercise due care is presumed from a violation of a "statute, ordinance, or regulation of a public entity." Cal. Evid. Code, § 669(a)(1). By its terms, this doctrine applies to the law of any public entity, not just California public entities. See, e.g., DiRosa v. Showa Denko K.K. (1996) 44 Cal.App.4th 799, 808. Thus, under California law, a money damages remedy exists for negligent violation of the FDCA and regulations promulgated thereunder which proximately cause injuries, and there is no need for California's Legislature to act in order to create such a remedy.

242.    Plaintiff's negligence claim is, thus, not preempted by Section 360k(a), because the violations alleged are all based on federal statutory and regulatory standards which includes no "requirement which is different from, or in addition to, any requirement applicable under" the FDCA

243.    and regulations promulgated thereunder. As such, the claims set forth in this cause of action contain requirements that are parallel to the FDCA and regulations promulgated thereunder.

### FOURTH CAUSE OF ACTION

**(Fraud – Intentional Misrepresentation and Concealment)**

**Against All Defendants**

244.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

245.    Each Defendant actively participated in, agreed to, aided and abetted, conspired in, and/or furthered a fraudulent scheme, as set forth herein, which conduct constitutes fraud and deceit.

246.    Defendants superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and dangers of BIA-ALCL and their international dissemination of promotional and marketing information about Silicone Textured Breast Implants for the purpose of maximizing its sale, each give rise to the affirmative duty to meaningfully disclose important material facts concerning the safety of the Silicone Textured Breast Implants, specifically regarding the risks of developing BIA-ALCL.

247.    Defendants omitted material information to the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff as part of a deliberate and intentional effort to induce such persons and entities to rely on the omissions and to allow the Silicone Textured Breast Implants to be in and remain in the marketplace for purchase. Through their omissions, Defendants actively conspired to and did conceal the risks of BIA-ALCL associated with the Silicone Textured Breast Implants.

248.    Defendants omitted material information regarding the risks of BIA-ALCL and the presence of a MENTOR Silicone Textured Breast Implants with intent to defraud the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff.

249.    Defendants intentionally failed to disclose material facts to the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff that they had a duty to disclose,

-50-

including the risks of BIA-ALCL associated with the Silicone Textured Breast Implants. Each Defendant was aware of and/or approved the material omissions by or on behalf of Defendants.

250.    Moreover, Defendants made representations about BIA-ALCL but did not disclose facts which materially qualified the facts disclosed, which rendered their disclosure likely to mislead. The true facts about BIA-ALCL and the presence of a MENTOR Silicone Textured Breast Implants were known to Defendants, and Defendants knew they were not known to or reasonably discoverable by Plaintiff.

251.    Defendants knew that their half-truths, concealment and failure to disclose to Plaintiff, by and through the FDA, medical and scientific community, and her device user facility, all information reasonably available to them related to the nexus between BIA-ALCL and their Silicone Textured Breast Implants, would mislead Plaintiff by creating the false impression that the full extent of BIA-ALCL's relationship with the Silicone Textured Breast Implants was already a known and disclosed by MENTOR, and further that MENTOR's breast implants were no more likely to be found in individuals suffering from BIA-ALCL than other companies' products. Defendants also knew that if Plaintiff became aware of the cancerous propensities associated the Silicone Textured Breast Implants, Plaintiff would not agree to purchase said implants.

252.    Nevertheless, in willful disregard of Plaintiff's rights and the duties owed to Plaintiff by Defendants, and each of them, concealed and failed to disclose to Plaintiff all information reasonably available to them related to the nexus between BIA-ALCL and their Silicone Textured Breast Implants with the express purpose of inducing Plaintiff against her own interest to purchase their cancerous breast implants.

253.    Likewise, Defendants had a statutory and regulatory duty on all matters related to adverse events of BIA-ALCL associated with their Silicone Textured Breast Implants to report in a manner that avoided making any written or oral communication containing an untrue statement or omitting any material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading.

///

254.     However, as part of their scheme designed to downplay the risks of Silicone Textured Breast Implants in the medical device reports and to induce the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff into believing that there was no unique risks of BIA-ALCL associated with their Silicone Textured Breast Implants in order to sell more implants, Defendants willfully concealed and failed to disclose all information reasonably known to it in the MDRs.

255.     The principle fraudulent omission in these MDRs was the failure to acknowledge that BIA-ALCL is exclusively found in textured implants and that MENTOR's Silicone Textured Breast Implants are associated with more cases than any other type of textured implant–by far.

256.     Moreover, Defendants omitted, suppressed, and concealed material facts concerning the dangers and risks of injuries associated with Silicone Textured Breast Implants and BIA-ALCL. Specifically, Defendants deliberately failed to file medical device reports associated with BIA-ALCL events despite its obligations under 21 U.S.C. 360 and 21 C.F.R. § 803.50—and deliberately and willfully concealed the increased risk of BIA-ALCL associated with its Silicone Textured Breast Implants when it did not report these events in any form to the FDA.

257.     Defendants intended the FDA, the medical and scientific community, and device user facilities, and patients to rely on the Defendants' important material representations and concealment regarding the safety of the Silicone Textured Breast Implants and their link to BIA-ALCL.

258.     Plaintiff, by and through the FDA, medical and scientific community, and her device user facility, did in fact rely on and were induced by Defendants' misrepresentations, omissions, or active concealment of the dangers of Silicone Textured Breast Implants and the link to BIA-ALCL.

259.     Plaintiff, her physician, her device user facility, and the medical and scientific community did not know that the representations made by the Defendants were false and were justified in relying upon Defendants' representations.

260.     As the direct and proximate result of Defendant's fraudulent misrepresentations and intentional concealment of facts concerning the Silicone Textured Breast Implants, upon which Plaintiff

reasonably relied, she was implanted with Silicone Textured Breast Implants and suffered, or will suffer, painful removal procedures to mitigate the risk of developing BIA-ALCL, as well as any treatment, therapy, recovery, and expense associated with the removal of the Silicone Textured Breast Implants, the potential for the development of BIA-ALCL, and any condition or symptoms associated with BIA-ALCL or the prevention of that issue.

261.    As a further proximate result of Defendant's fraudulent misrepresentations and intentional concealment of facts concerning the Silicone Textured Breast Implants, Plaintiff suffered debilitating physical pain and mental suffering, was/will be required to undergo additional surgeries and other procedures, incurred substantial hospital, medical, nursing and pharmaceutical expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of earnings; and loss of quality of life, and all of these injuries are permanent and continuing.

262.    Defendants' fraudulent misrepresentations evidenced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff, as well as their goal to place company profits over the safety of hundreds of thousands of consumers, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct and based on the wealth of said Defendants.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation and Concealment)

### Against All Defendants

263.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

264.    Each Defendant negligently participated in, agreed to, aided and abetted, conspired in, and/or furthered a fraudulent scheme, as set forth herein, which conduct constitutes negligent misrepresentation and concealment.

265.    Defendants superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and dangers of BIA-ALCL and

their international dissemination of promotional and marketing information about Silicone Textured Breast Implants for the purpose of maximizing its sale, each give rise to the affirmative duty to meaningfully disclose important material facts concerning the safety of the Silicone Textured Breast Implants, specifically regarding the risks of developing BIA-ALCL.

266.    Defendants negligently omitted material information to the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff which induced such persons and entities to rely on the omissions and to allow the Silicone Textured Breast Implants to be in and remain in the marketplace for purchase. Through their negligent omissions, Defendants concealed the risks of BIA-ALCL associated with the Silicone Textured Breast Implants.

267.    Defendants negligently omitted material information regarding the risks of BIA-ALCL and the presence of a MENTOR Silicone Textured Breast Implants to the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff.

268.    Defendants negligently failed to disclose material facts to the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff that they had a duty to disclose, including the risks of BIA-ALCL associated with the Silicone Textured Breast Implants. Each Defendant was aware of and/or approved the material omissions by or on behalf of Defendants.

269.    Moreover, Defendants made representations about BIA-ALCL but did not disclose facts which materially qualified the facts disclosed, which rendered their disclosure likely to mislead. The true facts about BIA-ALCL and the presence of a MENTOR Silicone Textured Breast Implants were known to Defendants, and Defendants knew they were not known to or reasonably discoverable by Plaintiff.

270.    Defendants knew that their half-truths, concealment and negligent failure to disclose to Plaintiff, by and through the FDA, medical and scientific community, and her device user facility, all information reasonably available to them related to the nexus between BIA-ALCL and their Silicone Textured Breast Implants, would mislead Plaintiff by creating the false impression that the full extent of BIA-ALCL's relationship with the Silicone Textured Breast Implants was already a known and disclosed by MENTOR, and further that MENTOR's breast implants were no more likely to be found in

individuals suffering from BIA-ALCL than other companies' products. Defendants also knew that if Plaintiff became aware of the cancerous propensities associated the Silicone Textured Breast Implants, Plaintiff would not agree to purchase said implants.

271.     Nevertheless, in a negligent disregard of Plaintiff's rights and the duties owed to Plaintiff by Defendants, and each of them, concealed and negligently failed to disclose to Plaintiff all information reasonably available to them related to the nexus between BIA-ALCL and their Silicone Textured Breast Implants, thereby inducing Plaintiff against her own interest to purchase their cancerous breast implants.

272.     Likewise, Defendants had a statutory and regulatory duty on all matters related to adverse events of BIA-ALCL associated with their Silicone Textured Breast Implants to report in a manner that avoided making any written or oral communication containing an untrue statement or omitting any material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading.

273.     However, Defendants negligently downplayed the risks of Silicone Textured Breast Implants in the medical device reports, thereby inducing the FDA, the medical and scientific community, device user facilities, and consumers like Plaintiff into believing that there were no unique risks of BIA-ALCL associated with their Silicone Textured Breast Implants. As a result, MENTOR negligently concealed and failed to disclose all information reasonably known to it in the MDRs.

274.     The principle fraudulent omission in these MDRs was the failure to acknowledge that BIA-ALCL is exclusively found in textured implants and that MENTOR's Silicone Textured Breast Implants are associated with more cases than any other type of textured implant—by far.

275.     Moreover, Defendants negligently omitted, suppressed, and concealed material facts concerning the dangers and risks of injuries associated with Silicone Textured Breast Implants and BIA-ALCL. Specifically, Defendants negligently failed to file medical device reports associated with BIA-ALCL events despite its obligations under 21 U.S.C. 360 and 21 C.F.R. § 803.50—and negligently concealed the increased risk of BIA-ALCL associated with its Silicone Textured Breast Implants when it did not reports these events in any form to the FDA.

276.    Defendants intended the FDA, the medical and scientific community, and device user facilities, and patients to rely on the Defendants' important material representations regarding the safety of the Silicone Textured Breast Implants and its link to BIA-ALCL.

277.    Plaintiff, by and through the FDA, the medical and scientific community, and her device user facility, did in fact rely on and were induced by Defendants' negligent misrepresentations, omissions, or concealment of the dangers of Silicone Textured Breast Implants and the link to BIA-ALCL.

278.    Plaintiff, her physicians, her device user facility, and the medical and scientific community did not know that the representations made by the Defendants were false and were justified in relying upon Defendants' representations.

279.    As the direct and proximate result of Defendant's negligent misrepresentations and concealment of facts concerning the Silicone Textured Breast Implants, upon which Plaintiff reasonably relied, she was implanted with Silicone Textured Breast Implants and suffered, or will suffer, painful removal procedures to mitigate the risk of developing BIA-ALCL, as well as any treatment, therapy, recovery, and expense associated with the removal of the Silicone Textured Breast Implants, the potential for the development of BIA-ALCL, and any condition or symptoms associated with BIA-ALCL or the prevention of that issue.

280.    As a further proximate result of Defendant's negligent misrepresentations and concealment of facts concerning the Silicone Textured Breast Implants, Plaintiff suffered debilitating physical pain and mental suffering, was/will be required to undergo additional surgeries and other procedures, incurred substantial hospital, medical, nursing and pharmaceutical expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of earnings; and loss of quality of life, and all of these injuries are permanent and continuing.

///

///

///

## SIXTH CAUSE OF ACTION

### (Loss of Consortium)

### Plaintiff Against Defendants

281.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

282.    As a result of the injuries and damages caused to Plaintiff Beverly Rose by Defendants' tortious conduct in violation of federal law and the post-approval requirements, Beverly Rose was unable to perform activities she had previously commonly performed for the household, for the family, and for her own support. Consequently, Plaintiff Jack G. Rose was required to:

a.    Perform all activities and upkeep around the house; and/or

b.    Support Beverly Rose by performing activities she previously performed for her own needs and maintenance; and/or

283.    As a result of Defendants' defective and adulterated Mentor® Breast Implants and the development of Beverly Rose's BIA-ALCL, Plaintiff Jack G. Rose effectively lost the companionship and accompaniment of his wife.

284.    As a further result of Defendants' defective and adulterated Mentor® Breast Implants and the injuries they caused to Beverly Rose and the resulting demands placed upon her, Jack G. Rose has suffered damages.

285.    As a direct and proximate result of the injuries caused to Plaintiff Beverly Rose by Defendants' tortious conduct, Spouse Plaintiff Jack G. Rose suffered and will continue to suffer the loss of his wife's consortium, companionship, society, intimacy, affection, services and support, and suffered and will continue to suffer damages.

///

///

///

## PUNITIVE DAMAGE ALLEGATIONS

### (Brought by Plaintiff Against Defendants)

286.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

287.    The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were willful and malicious and were done with a conscious disregard for the rights of Plaintiff as a user of Defendants' Silicone Textured Breast Implants and for the primary purpose of increasing Defendants' profits from the sale and distribution of Silicone Textured Breast Implants. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

288.    Prior to the manufacturing, sale, and distribution of Silicone Textured Breast Implants, Defendants and each of them knew that said implants were in a defective condition as previously described herein and knew that those who were implanted with Silicone Textured Breast Implants would be at a heightened risk of developing BIA-ALCL, and would therefore experience and did experience severe physical, mental and emotional injuries. Further, Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the Silicone Textured Breast Implants presented a substantial and unreasonable risk of harm due to BIA-ALCL to the public, including Plaintiff, and as such, was unreasonably subjected to the risk of injury or death from the implantation of Silicone Textured Breast Implants.

289.    Despite such knowledge, Defendants, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in said Silicone Textured Breast Implants and failed to warn the public, including Plaintiff, of the risk of developing BIA-ALCL occasioned by said defects inherent in said Silicone Textured Breast Implants. Said Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of said

Exhibit A - Page 63

Silicone Textured Breast Implants knowing persons would be exposed to serious danger in order to advance Defendants' own pecuniary interests and monetary profits.

290.    Defendants conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages under Civil Code § 3294.

291.    Based on the foregoing, the conduct alleged herein was despicable and subjected Plaintiff to cruel and unjust hardship in conscious disregard of their rights, constituting oppression for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. Defendants' conduct evidences a conscious disregard for the safety of others, including Plaintiff. Plaintiff is entitled to an award of punitive damages sufficient to punish and make an example of these Defendants and to deter Defendants and others from engaging in similar conduct in the future.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiff demands judgment for the following:

1.    Past and future medical and incidental expenses, according to proof;

2.    Past and future loss of earnings and/or earning capacity, according to proof;

3.    Past and future general damages, according to proof;

4.    Loss of consortium damages, according to proof;

5.    Punitive and exemplary damages in an amount to be determined at trial;

6.    Prejudgment and post judgment interest;

7.    Costs to bring this action; and

8.    Such other and further relief as the court may deem just and proper.

///
///
///
///

1  Dated: November 4, 2021

2

3                                          Respectfully submitted,

4

5                              By:    _____

6                                     Jennifer A. Lenze, State Bar No. 246858
                                      **LENZE LAWYERS, PLC**
7                                     1300 Highland Ave, Suite 207
                                      Manhattan Beach, CA 90266
8                                     Tel:    310-322-8800
                                      Fax:    310-322-8811
9                                     jlenze@lenzelawyers.com
                                      Counsel for the Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 4, 2021

LENZE LAWYERS PLC

By: _____

Jennifer A. Lenze, State Bar No. 246858
**LENZE LAWYERS, PLC**
1300 Highland Ave, Suite 207
Manhattan Beach, CA 90266
Tel:    310-322-8800
Fax:    310-322-8811
jlenze@lenzelawyers.com
Counsel for the Plaintiff

-61-

**COMPLAINT AND DEMAND FOR JURY TRIAL**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jennifer A. Lenze, Esq.  Bar ID: 246858
LENZE LAWYERS, PLC
1300 Highland Avenue, Suite 207 Manhattan Beach, CA 90266
TELEPHONE NO.: (310) 322-8800     FAX NO. *(Optional):* (310) 322-8811
E-MAIL ADDRESS: jlenze@lenzelawyers.com
ATTORNEY FOR *(Name):* Attorneys for Plaintiff, Beverly Rose, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 325 South Melrose Drive
MAILING ADDRESS:
CITY AND ZIP CODE: Vista, CA 92081
BRANCH NAME: Northy County

**FOR COURT USE ONLY**

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**11/04/2021** at 10:23:38 AM

Clerk of the Superior Court
By Amy Woolf, Deputy Clerk

CASE NAME:
BEVERLY ROSE AND JACK G. ROSE v. MICHAEL NICCOLE, M.D. et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ **Unlimited** (Amount demanded exceeds $25,000) ☐ **Limited** (Amount demanded is $25,000) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 37-2021-00046860-CU-PL-NC |
| | | JUDGE: DEPT.: Judge Robert P Dahlquist |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☒ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify):*
5. This case ☐ is ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 11/4/2021

Jennifer A. Lenze, Esq.
_____
(TYPE OR PRINT NAME)          ► _____
                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev.September 1, 2021]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

American LegalNet, Inc.
www.FormsWorkFlow.com

Exhibit A - Page 67

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (c.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

American LegalNet, Inc.
www.FormsWorkFlow.com

Exhibit A - Page 68

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

| | |
|---|---|
| STREET ADDRESS: | 325 S Melrose DRIVE |
| MAILING ADDRESS: | 325 S Melrose DRIVE |
| CITY AND ZIP CODE: | Vista, CA 92081-6695 |
| DIVISION: | North County |
| TELEPHONE NUMBER: | (760) 201-8029 |

PLAINTIFF(S) / PETITIONER(S):    BEVERLY ROSE et.al.

DEFENDANT(S) / RESPONDENT(S):  MICHAEL NICCOLE MD et.al.

ROSE VS NICCOLE MD [IMAGED]

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | CASE NUMBER: 37-2021-00046860-CU-PL-NC |
|---|---|

## CASE ASSIGNED FOR ALL PURPOSES TO:

Judge:  Robert P Dahlquist                                    Department: N-29

## COMPLAINT/PETITION FILED: 11/04/2021

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 04/08/2022 | 09:00 am | N-29 | Robert P Dahlquist |

Due to the COVID-19 pandemic, all Case Management Conferences (CMCs) are being conducted virtually unless there is a court order stating otherwise. Prior to the hearing date, visit the "virtual hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC. (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal. Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):
- **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint. An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint. A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed. If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
- **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
- **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6). If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date. See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged. The court encourages and expects the parties to consider using ADR options prior to the CMC. The use of ADR will be discussed at the CMC. Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases.  Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing.  E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court.  All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program."  This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain.  The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150.  Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed.  Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.

Exhibit A - Page 70

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Jennifer Lenze, 246858<br>Lenze Lawyers, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>TELEPHONE NO.: (310)322-8800<br>ATTORNEY FOR (Name): Plaintiff | FOR COURT USE ONLY<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**11/16/2021** at 03:54:00 PM<br><br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, San Diego County
325 S. Melrose Drive
Vista, CA 92081

| | |
|---|---|
| PLAINTIFF/PETITIONER: BEVERLY ROSE AND JACK G. ROSE, wife and husband<br><br>DEFENDANT/RESPONDENT: MICHAEL NICCOLE, M.D., et al. | CASE NUMBER:<br>37-2021-00046860-CU-PL-NC |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Service of Compl |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of: Complaint, Civil Case Cover Sheet, Summons, Notice of Case Assignment and Case Management Conference, Alternative Dispute Resolution (ADR) Information

3. a. Party served: MICHAEL NICCOLE, M.D.

   b. Person Served: Party in item 3a.
4. Address where the party was served: 1101 Bayside Dr, 200
   Newport Beach, CA 92625
5. I served the party
   b. by substituted service. On (date): 11/12/2021   at (time): 4:42PM   I left the documents listed in item 2 with or in the presence of: Gina Band - Front Desk - Person In Charge Of Office
      (1) (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (4) A declaration of mailing is attached.
      (5) I attach a declaration of diligence stating actions taken first to attempt personal service.
6. The "Notice to the Person Served" (on the summons) was completed as follows:

   a. as an individual defendant.

7. **Person who served papers**
   a. Name:      Joe Lomeli
   b. Address:   One Legal - P-000618-Sonoma
                 1400 North McDowell Blvd, Ste 300
                 Petaluma, CA 94954
   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 117.00
   e. I am:
      (3) registered California process server.
         (i) Employee or independent contractor.
         (ii) Registration No.: 2017240410
         (iii) County: Los Angeles
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 11/16/2021

Joe Lomeli
_____
(NAME OF PERSON WHO SERVED PAPERS)                              (SIGNATURE)

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | Code of Civil Procedure, § 417.10 |

**PROOF OF SERVICE OF SUMMONS**

OL# 17180134

Exhibit A - Page 71

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| Jennifer Lenze, 246858<br>Lenze Lawyers, PLC<br>1300 Highland Avenue<br>Manhattan Beach, CA 90266 | | (310)322-8800 | |
| ATTORNEY FOR (Name): Plaintiff | Ref. No. or File No.<br>Service of Compl | | |

Insert name of court, judicial district or branch court, if any:

North
325 S. Melrose Drive
Vista, CA 92081

PLAINTIFF:

BEVERLY ROSE AND JACK G. ROSE, wife and husband

DEFENDANT:

MICHAEL NICCOLE, M.D., et al.

| **DECLARATION OF<br>DILIGENCE** | | | | CASE NUMBER:<br>37-2021-00046860-CU-PL-NC |
|---|---|---|---|---|

I received the within process on 11/4/2021 and that after due and diligent effort I have been unable to personally serve said party. The following itemization of the dates and times of attempts details the efforts required to effect personal service. Additional costs for diligence are recoverable under CCP §1033.5 (a)(4)(B).

PARTY SERVED: MICHAEL NICCOLE, M.D.

(1)Business: CosmetiCare 1101 Bayside Dr, 200, Newport Beach, CA 92625

As enumerated below:

On 11/8/2021 12:15:00 PM at address (1) above. Not In per front desk, doctor is not in and they don't know when he will be
On 11/9/2021 9:36:00 AM at address (1) above. No Answer closed no business hours posted no visible activity knocked but no one came to the door
On 11/12/2021 4:42:00 PM at address (1) above. Not In

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 11/16/2021 at Petaluma, California.

Registered California process server.
County: Los Angeles
Registration No.: 2017240410
Joe Lomeli
One Legal - P-000618-Sonoma
1400 North McDowell Blvd, Ste 300
Petaluma, CA 94954



OL#: 17180134

Exhibit A - Page 72

| ATTORNEY OR PARTY WITHOUT AN ATTORNEY (Name and Address): | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| Jennifer Lenze, 246858<br>Lenze Lawyers, PLC<br>1300 Highland Avenue<br>Manhattan Beach, CA 90266 | | (310)322-8800 | |
| ATTORNEY FOR (Name): Plaintiff | Ref. No. or File No.<br>Service of Compl | | |

Insert name of court, judicial district or branch court, if any:

North
325 S. Melrose Drive
Vista, CA 92081

PLAINTIFF:

BEVERLY ROSE AND JACK G. ROSE, wife and husband

DEFENDANT:

MICHAEL NICCOLE, M.D., et al.

| **PROOF OF SERVICE BY MAIL** | | | | CASE NUMBER:<br>37-2021-00046860-CU-PL-NC |
|---|---|---|---|---|

I am a citizen of the United States, over the age of 18 and not a party to the within action. My business address is 1400 N. McDowell Blvd, Petaluma, CA 94954.

On 11/16/2021, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCP 4(e)(2)(B) or FRCP 4(h)(1)(B) was made (if applicable), I mailed copies of the:

Complaint, Civil Case Cover Sheet, Summons, Notice of Case Assignment and Case Management Conference, Alternative Dispute Resolution (ADR) Information

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Petaluma , California, addressed as follows:

MICHAEL NICCOLE, M.D.

1101 Bayside Dr, 200
Newport Beach, CA 92625

I am readily familiar with the firm's practice for collection and processing of documents for mailing.  Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

| Fee for Service: $ 117.00 | I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 11/16/2021 at Petaluma, California. |
|---|---|

One Legal - P-000618-Sonoma
1400 North McDowell Blvd, Ste 300
Petaluma, CA 94954



Melissa Berry

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jennifer Lenze, 246858<br>Lenze Lawyers, PLC<br>1300 Highland Avenue, Suite 207<br>Manhattan Beach, CA 90266<br>TELEPHONE NO.: (310)322-8800<br>ATTORNEY FOR *(Name):* Plaintiff | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**01/05/2022** at 05:43:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, San Diego County

325 S. Melrose Drive

Vista, CA 92081

| PLAINTIFF/PETITIONER: Beverly Rose, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Michael Niccole, M.D., et al. | 37-2021-00046860-CU-PL-NC |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Service of Mentor |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:

Summons, Complaint, Civil Case Cover Sheet, Notice of Case Assignment

3. a. Party served:  MENTOR WORLDWIDE, LLC

   b. Person Served: CT Corp - Diana Ruiz, Process Specialist - Person Authorized to Accept Service of Process

4. Address where the party was served:  330 North Brand Blvd, #700
                                                        Glendale, CA 91203
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party (1) on  (date): 01/04/2022             (2) at  (time): 12:23PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

   MENTOR WORLDWIDE, LLC
      under: Other: Limited Liability Company
7. **Person who served papers**
   a.  Name:        Jessica Brown
   b.  Address:      One Legal - P-000618-Sonoma
                        1400 North McDowell Blvd, Ste 300
                        Petaluma, CA 94954

   c.  Telephone number: 415-491-0606
   d.  The fee for service was: $ 40.00
   e I am:
       (3)  registered California process server.
           (i)  Employee or independent contractor.
           (ii)  Registration No.: 2019217220
           (iii) County:  Los Angeles

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 01/04/2022


Jessica Brown

(NAME OF PERSON WHO SERVED PAPERS)                                                      (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br><br>OL# 17451721 |
|---|---|---|

Exhibit A - Page 74

1   Robert W. Frank, SBN 95392
2   Marisa D. Sarti, SBN 330746
    NEIL, DYMOTT, FRANK, MCCABE & HUDSON
3   A Professional Law Corporation
    110 West A Street, Suite 1200
4   San Diego, CA 92101
    **P** 619.238.1712 / **F** 619.238.1562
5
6   Attorneys for Defendant
    MICHAEL NICCOLE, M.D.

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/10/2022** at 01:54:00 PM

Clerk of the Superior Court
By Ashley Carini,Deputy Clerk

7

8                **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9             **COUNTY OF SAN DIEGO – NORTH COUNTY DIVISION**

10  BEVERLY ROSE AND JACK G. ROSE,      )   CASE NO. 37-2021-00046860-CU-PL-NC
11  wife and husband,                   )   *[IMAGED FILE]*
                                        )
12          Plaintiffs,                 )   **DEFENDANT MICHAEL NICCOLE, MD'S**
                                        )   **DEMURRER TO PLAINTIFFS'**
13  vs.                                 )   **COMPLAINT**
                                        )
14  MICHAEL NICCOLE, M.D.; MENTOR       )   **RESERVATION NO. 2471871**
    WORLDWIDE, LLC and DOES 1-100,      )   Hearing Date:   04/15/22
15  inclusive,                          )   Hearing Time:   1:30 p.m.
                                        )
16          Defendants.                 )   Judge: Hon. Robert P. Dahlquist
                                        )   Dept.: N-29
17  _____)   Filed: 11/04/21

18

19          **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

20          PLEASE TAKE NOTICE that on April 15, 2022 at 1:30 p.m. in the above-titled court,

21  Defendant MICHAEL NICCOLE, MD (hereinafter Dr. Niccole) brings his demurrer to Plaintiffs

22  BEVERLY ROSE and JACK G. ROSE's (hereinafter Plaintiffs) Complaint.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

00473543.DOCX                                      1

**DEFENDANT MICHAEL NICCOLE, MD'S DEMURRER TO PLAINTIFFS' COMPLAINT**

The Demurrer is made on the grounds that, pursuant to California Code of Civil Procedure section 430.010. Defendant Dr. Niccole will and does hereby demurrer to Plaintiffs' Complaint on each of the following grounds:

## DEMURRER TO FIRST CAUSE OF ACTION FOR STRICT PRODUCT LIABILITY – FAILURE TO WARN

The First Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 430(e) and (f).

## DEMURRER TO SECOND CAUSE OF ACTION FOR STRICT PRODUCT LIABILITY – MANUFACTURING DEFECT

The Second Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 430(e) and (f).

## DEMURRER TO THIRD CAUSE OF ACTION FOR NEGLIGENCE

The Third Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 430(e) and (f).

## DEMURRER TO FOURTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION/CONCEALMENT

The Fourth Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 338(d) and 430(e) and (f).

## DEMURRER TO FIFTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION/CONCEALMENT

The Fifth Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 430(e) and (f).

## DEMURRER TO SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION/CONCEALMENT

The Sixth Cause of Action of the Complaint fails to state facts sufficient to constitute a cause of action against Defendant Dr. Niccole and is uncertain. See Code of Civil Procedure section 430(e) and (f).

1    This Demurrer is based on this Notice, the accompanying Memorandum of Points and

2  Authorities, Declaration of Marisa D. Sarti, Esq. with exhibits, and the complete contents of the file

3  and records of this case.

4  Dated:  January 10, 2022              NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC

5

6                                        By: _____

7                                            Robert W. Frank
                                             Marisa D. Sarti
8                                            Attorneys for Defendant
                                             MICHAEL NICCOLE, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Beverly Rose and Jack Rose v. Michael Niccole, MD, et al.**

SDSC Case No. 37-2021-00046860-CU-PL-NC

**PROOF OF SERVICE**
[Code Civ. Proc., §§ 1013A (3) and 2015.5]

I, the undersigned, am employed in the county of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 110 West A Street, Suite 1200, San Diego, California 92101. On this same day, I served the foregoing document(s) described as

**DEFENDANT MICHAEL NICCOLE, MD'S DEMURRER TO PLAINTIFFS' COMPLAINT**

on the parties in this action named herein:

Jennifer A. Lenze, Esq.                  **Attorneys for Plaintiffs:**
LENZE LAWYERS, PLC                  BEVERLY ROSE and JACK G. ROSE
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266
Tel.:   (310) 322-8800
Fax:   (310) 322-8811
jlenze@lenzelawyers.com

☒   **BY ELECTRONIC TRANSMISSION VIA EMAIL** – By e-mailing the document(s) to the persons at the e-mail address(es) above. This is necessitated during the declared national emergency due to the Coronavirus (COVID-19) pandemic. Hard copies will be provided upon request.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on January 10, 2022 at San Diego, California.

Cindy Frederick

00473543.DOCX

1

PROOF OF SERVICE

1   Robert W. Frank, SBN 95392
2   Marisa D. Sarti, SBN 330746
    NEIL, DYMOTT, FRANK, MCCABE & HUDSON
3   A Professional Law Corporation
    110 West A Street, Suite 1200
4   San Diego, CA 92101
    **P** 619.238.1712 / **F** 619.238.1562
5
6   Attorneys for Defendant
    MICHAEL NICCOLE, M.D.

7

8

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/10/2022** at 01:54:00 PM
Clerk of the Superior Court
By Ashley Carini, Deputy Clerk

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9

### COUNTY OF SAN DIEGO – NORTH COUNTY DIVISION

10

| | |
|---|---|
| BEVERLY ROSE AND JACK G. ROSE, wife and husband, | ) CASE NO. 37-2021-00046860-CU-PL-NC |
| Plaintiffs, | ) *[IMAGED FILE]* |
| vs. | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT OF** |
| | ) **DEFENDANT MICHAEL NICCOLE, M.D.'S** |
| MICHAEL NICCOLE, M.D.; MENTOR | ) **DEMURRER TO PLAINTIFFS'** |
| WORLDWIDE, LLC and DOES 1-100, | ) **COMPLAINT** |
| inclusive, | ) |
| | ) **RESERVATION NO. 2471871** |
| Defendants. | ) Hearing Date:   04/15/22 |
| | ) Hearing Time:   1:30 p.m. |
| | ) |
| | ) Judge: Hon. Robert P. Dahlquist |
| | ) Dept.: N-29 |
| | ) Filed: 11/04/21 |

19          Defendant, MICHAEL NICCOLE, M.D., hereby submits the following memorandum of

20   points and authorities in support of his Demurrer to Plaintiffs' Complaint.  In compliance with Code

21   of Civil Procedure (C.C.P.) section 430.41, defendants sent a meet and confer letter dated

22   December 28, 2021, regarding Plaintiffs' Complaint in an effort to avoid filing a Demurrer.  (See

23   Declaration of Marisa D. Sarti.) An agreement could not be reached by the parties. Defendant,

24   MICHAEL NICCOLE, M.D., hereby submits the following memorandum of points and authorities.

25   / / /

26   / / /

27   / / /

28   / / /

1

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION............................................................................ 6

II.   SUMMARY OF FACTS................................................................. 6

III.  LEGAL STANDARD.................................................................... 8

IV.  ARGUMENT.................................................................................. 9

     A.    PLAINTIFFS' COMPLAINT DOES NOT STATE FACTS
           SUFFICIENT TOCONSTITUTE A CAUSE OF ACTION.................... 9

     B.    PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION
           FOR STRICT LIABILITY DO NOT STATE SUFFICIENT
           FACTS TO CONSTITUTE A CAUSE OF ACTION
           FOR PRODUCTS LIABILITY AND ARE UNCERTAIN............... 10

           1.    Plaintiffs' First and Second Causes of Action Do
                Not State Sufficient Facts to Constitute a Cause
                of Action for Products Liability.......................................... 10

           2.    Plaintiffs' First and Second Causes of Action
                for Strict Liability are Uncertain........................................ 11

     C.    PLAINTIFFS' THIRD CAUSE OF ACTION DOES NOT
           STATE SUFFICIENTFACTS TO CONSTITUTE A CAUSE
           OF ACTION FOR GENERAL NEGLIGENCE AND
           IS UNCERTAIN............................................................................ 12

           1.    Plaintiffs' Third Cause of Action Does Not State
                Sufficient Facts to Constitute a Cause of Action
                for General Negligence...................................................... 12

           2.    Plaintiffs' Third Cause of Action for General Negligence
                 is Uncertain.......................................................................... 13

     D.    PLAINTIFFS' FOURTH CAUSE OF ACTION DOES
           NOT STATE SUFFICIENT FACTS TO CONSTITUTE
           A CAUSE OF ACTION FOR INTENTIONAL
           MISPRESENTATION AND IS UNCERTAIN............................. 13

           1.    Plaintiffs' Fourth Cause of Action Does Not
                 State Sufficient Facts to Constitute a Cause of Action
                 for Intentional Misrepresentation.................................... 13

            2.    Plaintiffs' Fourth Cause of Action for Intentional
                 Misrepresentation is Uncertain...................................... 14

2

Exhibit A - Page 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E.   PLAINTIFFS' FIFTH CAUSE OF ACTION DOES NOT
     STATE SUFFICIENT FACTS TO CONSTITUTE A CAUSE
     OF ACTION FOR NEGLIGENT MISPRESENTATION
     AND IS UNCERTAIN………………………………………   14

     1.   Plaintiffs' Fifth Cause of Action Does Not State
          Sufficient Facts to Constitute a Cause of Action
          for Negligent Misrepresentation…………………………   14

     2.   Plaintiffs' Fourth Cause of Action for Negligent
          Misrepresentation is Uncertain…………………………..   15

F.   PLAINTIFFS' SIXTH CAUSE OF ACTION DOES NOT
     STATE SUFFICIENT FACTS TO CONSTITUTE A CAUSE
     OF ACTION FOR LOSS OF CONSORTIUM………………………   15

G.   THE ONLY PROPER CAUSE OF ACTION PLAINTIFFS
     MAY PLEAD, FOR PROFESSIONAL NEGLIENCE, IS
     TIME BARRED BY THE APPLICABLE STATUTE
     OF LIMITATION……………………………………………   16

H.   PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND……..   16

V.   CONCLUSION……………………………………………………...   17

Exhibit A - Page 81

## TABLE OF AUTHORITIES

**PAGE**

*Alvarez v. Felker Mfg. Co.* (1964)
    230 Cal.App.2d 987, 999...................................................................... 9

*Anderson v. Owens-Corning Fiberglas Corp.* (1991)
    53 Cal.3d 987, 1002........................................................................... 12

*Aubry v. Tri-City Hospital District* (1992)
    2 Cal.4th 962, 967............................................................................. 8

*Carmichael v. Reitz* (1971)
    17 Cal.App.3d 958, 978-979................................................................ 10

*Cooper v. Equity General Insurance* (1990)
    219 Cal.App.3d 1252,1262................................................................... 13

*Daniels v. Select Portfolio Servicing Inc.* (2016)
    246 Cal.App.4th 1150, 1166................................................................ 13

*Davaloo v. Stare Farm Ins. Co.* (2005)
    135 Cal.App.4th 409, 415.................................................................... 11

*Embarcadero Municipal Improvement District v. County of Santa Barbara* (2001)
    88 Cal.App.4th 781, 786..................................................................... 8

*Frisvold v. Leaky* (1936)
    15 Cal.App.2d 752, 756...................................................................... 11

*Goodman v. Kennedy* (1976)
    18 Cal.3d 335, 349............................................................................. 16

*Greenman v. Yuba Power Products, Inc.* (1963)
    59 Cal.2d 57, 62................................................................................ 10

*Hall v. Department of Adoptions* (1975)
    47 Cal.App.3d 898, 904...................................................................... 13

*Hahn v. Mirda* (2007)
    147 Cal.App.4th 740, 746................................................................... 15

*Hector v. Cedars-Sinai Medical Center* (1986)
    180 Cal.App.3d 493............................................................................ 10

*Lopez v. Southern Cal. Rapid Transit Dist.* (1985)
    40 Cal.3d 780, 795............................................................................. 8

*Perkins v. Superior Court* (1981)
    117 Cal.App.3d 1, 6........................................................................... 8

4

*Schick v. Lerner* (1987)
    193 Cal.App.3d 1321, 1328………………………………………….. 8

*Shamsian v. Atlantic Richfield Co.* (2003)
    107 Cal.App.4th 967, 983………………………………………….. 14

*Silverhart v. Mount Zion Hospital* (1971)
    20 Cal.App.3d 1022………………………………………………….. 10

*Vanhooser v. Superior Court* (2012)
    206 Cal.App.4th 921, 927………………………………………….. 15

*Webber v. Inland Empire Invs.* (1999)
    74 Cal. App. 4th 884, 900………………………………………….. 9

## **STATUTES**

California Code of Civil Procedure
    Section 340.5………………………………………………………….. 16
    Section 425.10…………………………………………………. 8, 10, 14
    Section 430.10…………………………………………………….. 8
    Section 430.41…………………………………………………….. 1

MEMORANDUM IN SUPPORT OF DEFENDANT MICHAEL NICCOLE, M.D.'S DEMURRER TO PLAINTIFFS' COMPLAINT

Exhibit A - Page 83

# I.
## INTRODUCTION

Plaintiffs filed their Complaint on November 4, 2021 for Strict Product Liability, Failure to Warn; Strict Product Liability, Manufacturing Defect; Negligence; Intentional Misrepresentation/Concealment; Negligent Misrepresentation/Concealment; and Loss of Consortium against Michael Niccole, MD (hereinafter Dr. Niccole) and Mentor Worldwide LLC (hereinafter Mentor). Plaintiffs claims that Dr. Niccole is liable for Mentor's actions and omissions as he was an "alter ego" or "agent" of Mentor; however, the Complaint offers no facts to support their claims that Dr. Niccole was involved in or associated with Mentor or Mentor's breast implant products. Instead, the Complaint, states "Had Defendants substantially complied with PMA, rather than flagrantly under-performing the post-approval requirement as alleged above, *Plaintiff's plastic surgeon, Dr. Niccole would have learned of the risk of BIA-ALCL associated with Mentor Breast Implants and would have advised Plaintiff Beverly Rose to purchase a safer product.*" (Complaint, ¶ 129, emphasis added.) The Complaint states 11 times that Dr. Niccole, as Plaintiff's implanting physician, did not and could not have known about the risks of Mentor's implants. Yet, every Cause of Action plead in the Plaintiffs' Complaint requires that Dr. Niccole did have knowledge of the risks.

As such, Plaintiffs failed to state any facts that could constitute a cause of action against Dr. Niccole, and the Complaint is uncertain and unintelligible as to the claims against Dr. Niccole. Additionally, Plaintiffs made only conclusory statements and failed to meet the heightened pleading requirement for fraud. Therefore, Dr. Niccole requests the Court sustain his Demurrer as to all Causes of Action without leave to amend.

# II.
## SUMMARY OF FACTS

In 1985, Plaintiff Beverly Rose received Mentor breast implants. (Complaint, ¶ 176.) It was later discovered that Mentor's product posed a potential risk of BIA-ALCL. The Complaint states that "Had Defendants substantially complied with PMA, rather than flagrantly under-performing the post-approval requirement as alleged above, *Plaintiff's plastic surgeon, Dr. Niccole would have learned of the risk of BIA-ALCL associated with Mentor Breast Implants and would have advised Plaintiff*

1   Beverly Rose to purchase a safer product." (Complaint, ¶ 129, emphasis added.) Plaintiffs also state

2   that Mentor concealed its risk from "Mrs. Rose, *her implanting physician*, and the general public."

3   (Complaint, ¶ 124, emphasis added.) In fact, the Complaint states 11 times that Dr. Niccole, as the

4   implanting surgeon, could not have known about the risks Mentor concealed. (Complaint, ¶s 72, 112,

5   124, 129, 192, 198, 205, 215, 235, 259, 278).  However, every Cause of Action plead requires that

6   Dr. Niccole have knowledge of the implants' risks.

7        The Complaint claims that Defendants, Dr. Niccole and Mentor, were alter egos of one another

8   and acted in concert to convey false information and conceal the breast implants risks. (Complaint,

9   ¶¶ 16-18.) However, the Complaint did not include any information on the unity of the co-defendants'

10  interests and ownership, the inability to separate the LLC from the individual, how Dr. Niccole as an

11  individual was associated with Mentor, or whether there would be an inequitable result if Mentor was

12  sued alone. The Complaint also does not clarify the conflicting statements that Dr. Niccole had no

13  knowledge of the risks but somehow acted as Mentor's agent or alter ego.

14       Plaintiff Beverly Rose was diagnosed with Non-Hodgkin's Lymphoma. (Complaint, ¶ 182.)

15  On November 4, 2019, Plaintiff Beverly Rose underwent exploration of bilateral breast and full

16  spherical capsulectomies. (Complaint, ¶ 185.) During that surgery, silicone gelatinous oil was found

17  throughout Plaintiff's breast tissue. (Ibid.) Plaintiff brought this action because "Defendant Mentor,

18  through its misrepresentations and omissions including its refusal or reckless failures to disclose or

19  report defects and significant events as required…concealed from Plaintiff and her healthcare

20  providers the risk of BIA-ALCL associated with its Breast Implants." (Complaint, ¶ 187.)

21       Plaintiffs filed their Complaint on November 4, 2021, citing Strict Product Liability, Failure

22  to Warn; Strict Product Liability, Manufacturing Defect; General Negligence; Intentional

23  Misrepresentation/Concealment; Negligent Misrepresentation/Concealment; and Loss of Consortium

24  against Dr. Niccole and Mentor. Plaintiffs have not provided facts relating to Dr. Niccole's

25  involvement or association with Mentor, and thus failed to plead sufficient facts to state a cause of

26  action. Additionally, although all Causes of Action plead require Dr. Niccole have knowledge of the

27  breast implants' risks, the Complaint states Dr. Niccole could not have known about the risks Mentor

28

Exhibit A - Page 85

1   concealed. Dr. Niccole is unclear which Causes of Action actually apply to him and what facts

2   Plaintiffs base their Causes of Action.

3         On December 23, 2021, Plaintiffs' counsel granted an extension until January 10, 2022 for

4   Dr. Niccole to respond to the Complaint. (Declaration of Marisa D. Sarti, Exhibit A.) A meet and

5   confer letter was sent to Plaintiffs' counsel on December 28, 2021, discussing the insufficiently plead

6   and uncertain Causes of Action in the Complaint. (Declaration of Marisa D. Sarti, Exhibit B). After

7   not receiving a response from Plaintiffs' counsel, a follow-up email was sent on January 4, 2022.

8   Plaintiffs' counsel did not respond. (Declaration of Marisa D. Sarti.) A follow-up phone call was made

9   on January 5, 2022, where Dr. Niccole's counsel left a message with Plaintiffs' counsel's office

10   assistant. (Declaration of Marisa D. Sarti.) Plaintiffs' counsel has not responded to three meet and

11   confer attempts.

### III.
### <u>LEGAL STANDARD</u>

14        California Code of Civil Procedure section 430.10 authorizes a demurrer to challenge the

15   sufficiency of plaintiff's complaint. Statutory claims must be pleaded with particularity. (*Lopez v.*

16   *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 795.) Under the applicable standards "[only]"

17   properly pleaded factual allegations are deemed admitted for the purposes of a demurrer." (*Schick v.*

18   *Lerner* (1987) 193 Cal.App.3d 1321, 1328.) Conclusions of law do not fulfill the requirement of Code

19   of Civil Procedure section 425.10 without facts alleged to support the conclusory allegations. (*Perkins*

20   *v. Superior Court* (1981) 117 Cal.App.3d 1, 6.) Conclusions of law and fact are not accepted as true

21   and are disregarded. (*Embarcadero Municipal Improvement District v. County of Santa Barbara*

22   (2001) 88 Cal.App.4th 781, 786). The court does not assume the truth of contentions, deductions, or

23   conclusions of law. (*Aubry v. Tri-City Hospital District* (1992) 2 Cal.4th 962, 967.)

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

# IV.
## ARGUMENT

### A.   PLAINTIFFS' COMPLAINT DOES NOT STATE FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION

Plaintiffs' Complaint states that Dr. Niccole and Mentor acted as "the agent and alter ego of each other" to convey false and misleading information to "Plaintiff, Beverly Rose, her physician, the public, and other healthcare providers." (Complaint, ¶¶ 16-18.) However, Dr. Niccole was Plaintiff Beverly Rose's physician. (Complaint, ¶ 176.)

The alter ego doctrine requires there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist and there must be an inequitable result if the acts in question are treated as those of the corporation alone. (*Webber v. Inland Empire Invs.* (1999) 74 Cal. App. 4th 884, 900.) The essential characteristics of an agency relationship require (1) An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him. (*Alvarez v. Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999.)

Plaintiffs' Complaint makes the conclusory statement that Dr. Niccole and Mentor are alter egos of each other and ratified the conduct of one another without providing any other facts relating to this "relationship." The Complaint bases each and every Cause of Action against Dr. Niccole on Mentor's action. However, no information on the unity of the co-defendants' interests and ownership, the inability to separate the LLC from the individual, how Dr. Niccole as an individual was associated with Mentor, or whether there would be an inequitable result if Mentor was sued alone was provided anywhere within the Complaint. The Complaint makes the conclusionary statement that agency and alter ego doctrines apply without stating any facts sufficient to make such a conclusion.

Moreover, the Complaint states that "Had Defendants substantially complied with PMA, rather than flagrantly under-performing the post-approval requirement as alleged above, *Plaintiff's plastic surgeon, Dr. Niccole would have learned of the risk of BIA-ALCL associated with Mentor Breast*

9

1 | *Implants* and would have advised Plaintiff Beverly Rose to purchase a safer product." (Complaint, ¶

2 | 129, emphasis added.) Within the Complaint, Plaintiffs claim that Plaintiff Beverly Rose's implanting

3 | physician (i.e., Dr. Niccole) was unaware of the Mentor breast implant risks 11 times (Complaint,

4 | ¶¶ 72, 112, 124, 129, 192, 198, 205, 215, 235, 259, 278). Yet, nowhere in the Complaint do Plaintiffs

5 | state Dr. Niccole's involvement or association with Mentor, only the conclusory statement that he is

6 | the "alter ego" or "agent" of Mentor.

7 |      Conclusions of law do not fulfill the requirement of Code of Civil Procedure section 425.10

8 | without facts alleged to support the conclusory allegations. Under California law, conclusions of law

9 | and fact are not accepted as true and are disregarded. Consequently, the Complaint fails to state facts

10 | sufficient to show that Dr. Niccole was the alter ego or agent of Mentor, and such conclusory

11 | allegations should be disregarded. The Complaint does not state Dr. Niccole's involvement in

12 | distributing, manufacturing, marketing, selling, or otherwise knowing about the risks Mentor

13 | concealed, which all Causes of Actions are predicated on.

14 |      Therefore, Plaintiffs' Complaint does not allege that Dr. Niccole did anything improper. If

15 | anything, the Complaint repeatedly claims that Dr. Niccole, as the implanting physician, had no

16 | knowledge of the risks that Mentor concealed. Thus, the Complaint does not and cannot state facts

17 | sufficient to state a cause of action.

18 | **B.**  **PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION FOR STRICT**
     **LIABILITY DO NOT STATE SUFFICIENT FACTS TO CONSTITUTE A CAUSE OF**

19 |      **ACTION FOR PRODUCTS LIABILITY AND ARE UNCERTAIN**

20 |      **1.**    **<u>Plaintiffs' First and Second Causes of Action Do Not State Sufficient Facts to</u>**

21 |         **<u>Constitute a Cause of Action for Products Liability</u>.**

22 |      A manufacturer is strictly liable when a product it places on the market, knowing that it is to

23 | be used without inspection for defects, proves to have a defect that causes injury to a human being.

24 | (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62.) Moreover, California courts have

25 | repeatedly held that strict liability may not be imposed against healthcare providers for injuries

26 | suffered by their patients. When a physician furnishing his professional skills and services in treating

27 | a patient, he is not held strictly liable for a patient's injuries. (*Carmichael v. Reitz* (1971) 17

28 | Cal.App.3d 958, 978-979; See also *Hector v. Cedars-Sinai Medical Center* (1986) 180 Cal.App.3d

1    493, where a hospital was not found strictly liable for furnishing a defective pacemaker because it was

2    only a provider of medical services; *Silverhart v. Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, in

3    which strict liability in tort did not apply to hospital furnishing a defective surgical needle in

4    connection with care and treatment of the patient.)

5         Plaintiffs' Complaint does not state that Dr. Niccole manufactured Mentor's breast implants.

6    As noted, the Complaint only includes a conclusionary statement that Dr. Niccole was Mentor's "alter

7    ego" and "agent" without any other facts stating Dr. Niccole's involvement, association, interest, or

8    relationship with Mentor. Plaintiffs have failed to state facts that Dr. Niccole manufactured or

9    distributed the breast implants and thus knew about the breast implant defects. Likely because

10   Dr. Niccole has never been an agent or representative of Mentor and did not manufacture or distribute

11   any Mentor products.

12        Dr. Niccole, as stated in the Complaint, was Plaintiff's implanting physician. (Complaint, ¶s

13   176, 205.) As Plaintiff's physician strict liability may not be imposed against Dr. Niccole for

14   furnishing a product in his treatment of Plaintiff that was later discovered to be defective. As a result,

15   the Complaint does not plead facts that Dr. Niccole distributed the defective implants, and as the

16   treating physician, he may not be held liable for the defective product under California law. Therefore,

17   the Complaint fails to state facts necessary to constitute a Cause of Action for a Strict Products

18   Liability.

19       **2.**    **<u>Plaintiffs' First and Second Causes of Action for Strict Liability are Uncertain</u>.**

20        The requirement to specifically plead facts in a complaint is to apprise the defendant of the

21   circumstances upon which plaintiff relies and to prevent the defendant from being taken by surprise.

22   (*Frisvold v. Leaky* (1936) 15 Cal.App.2d 752, 756; see also *Davaloo v. Stare Farm Ins. Co.* (2005)

23   135 Cal.App.4th 409, 415 [complaint must contain allegations that "as a whole apprise [] the adversary

24   of the factual basis of the claim"].)

25        Plaintiffs' Complaint states that, "At the time *Plaintiff's physician implanted* the Silicone

26   Textured Breast Implants, *her physician did not have substantially the same knowledge* as the

27   Defendants about the unreasonably high risks of causing BIA-ALCL because the Defendants failed to

28   provide adequate warnings of those risks." (Complaint, ¶ 205, emphasis added.) Dr. Niccole is the

1  implanting surgeon (Complaint, ¶ 176.) Therefore, Plaintiffs' Complaint is stating that Dr. Niccole did

2  not know about the risk because the Defendants (which includes Dr. Niccole) concealed the risks. The

3  Complaint is essentially pleading that as the implant surgeon, Dr. Niccole did not know of the risks

4  because Dr. Niccole concealed the risk from the implanting surgeon (i.e., himself).  This does not

5  make sense.

6      Plaintiffs' Complaint is inconsistent, contradictory, and unintelligible. It is impossible for

7  Dr. Niccole to understand what is plead against him as the Complaint states that he could not have

8  known about the risks, but then is alleging that he did know about the risks. Therefore, Plaintiffs First

9  and Second Causes of Action are uncertain and unintelligible.

10 **C.   PLAINTIFFS' THIRD CAUSE OF ACTION DOES NOT STATE SUFFICIENT FACTS
       TO CONSTITUTE A CAUSE OF ACTION FOR GENERAL NEGLIGENCE AND IS
11     UNCERTAIN**

12

13     General negligence in a failure-to-warn case requires a plaintiff to prove that a manufacturer

14 or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of

15 care, i.e., what a reasonably prudent manufacturer would have known and warned about. (*Anderson v.*

16 *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002.)

17     **1.   Plaintiffs' Third Cause of Action Does Not State Sufficient Facts to Constitute a
            Cause of Action for General Negligence.**

18     Plaintiffs improperly allege a claim for General Negligence against Dr. Niccole under the basis

19 that he designed, manufactured, tested, marketed, and commercially distributed Mentor's breast

20 implants. (Complaint, ¶ 228-229.) The Complaint again makes a conclusory statement of law without

21 pleading any facts. The Complaint does not include facts related to Dr. Niccole participating in the

22 design, manufacture, testing, marketing, or commercial distribution of Mentor's implants; if

23 Dr. Niccole knew or should have known of the risk; or how Dr. Niccole's was involved or associated

24 with Mentor at all. Plaintiffs have failed to specify or plead any facts showing that Dr. Niccole knew

25 about the defects and had a duty to warn. Therefore, the Complaint does not and cannot plead sufficient

26 facts to state a Cause of Action against Dr. Niccole for General Negligence.

27 / / /

28 / / /

12

MEMORANDUM IN SUPPORT OF DEFENDANT MICHAEL NICCOLE, M.D.'S DEMURRER TO PLAINTIFFS' COMPLAINT

1    **2.    <u>Plaintiffs' Third Cause of Action for General Negligence is Uncertain</u>.**

2         The Complaint states that "Plaintiff and her physician were unaware that the Silicone Textured

3    Breast Implants were defective at the time of implant and thereafter." (Complaint, ¶ 235.) Dr. Niccole

4    was the implanting physician that the Complaint states was unaware of the defect. As such, Dr. Niccole

5    cannot have both a duty to warn or report (even though he is not an employee, agent, or representative

6    of Mentor) and also be unaware of the risks, as the Complaint states. Consequently, Dr. Niccole is

7    uncertain whether this Cause of Action is actually pleaded against him and if so, on what facts the

8    Plaintiffs are basing this allegation. Therefore, the Complaint is uncertain and unintelligible as to the

9    claim against Dr. Niccole for General Negligence.

10   **D.    PLAINTIFFS' FOURTH CAUSE OF ACTION DOES NOT STATE SUFFICIENT**
     **FACTS TO CONSTITUTE A CAUSE OF ACTION FOR INTENTIONAL**
11   **MISPRESENTATION AND IS UNCERTAIN**

12        The Fourth Cause of Action for Intentional Misrepresentation is insufficiently pleaded. "The

13   elements of a cause of action for intentional misrepresentation are (1) a misrepresentation, (2) with

14   knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4)

15   actual and justifiable reliance, and (5) resulting damage." (*Daniels v. Select Portfolio Servicing Inc.*

16   (2016) 246 Cal.App.4th 1150, 1166.) "Causes of action for intentional... misrepresentation sound in

17   fraud and, therefore, each element must be pleaded with specificity." (*Ibid.*) Every element of a

18   fraud cause of action must be alleged both factually and specifically. (*Hall v. Department of*

19   *Adoptions* (1975) 47 Cal.App.3d 898, 904; *Cooper v. Equity General Insurance* (1990) 219

20   Cal.App.3d 1252,1262.) This means "a plaintiff must allege facts showing how, when, where, to

21   whom, and by what means the representations were made, and in the case of a corporate defendant...

22   the names of the persons who made the representations, their authority to speak on behalf of the

23   corporation, to whom they spoke, what they said or wrote, and when the representation was made."

24   (*Daniels*, at p. 1166-1167.)

25   **1.    <u>Plaintiffs' Fourth Cause of Action Does Not State Sufficient Facts to Constitute a</u>**
     **<u>Cause of Action for Intentional Misrepresentation</u>.**
26

27        The Complaint fails to provide facts on Dr. Niccole's relationship or association with

28   Mentor, only a conclusory statement that Dr. Niccole was an agent or alter ego of Mentor. Plaintiff

---

13

1    has not plead any facts showing Dr. Niccole made knowingly false representations with intent to

2    deceive, and Plaintiff justifiably relied on those representations. The Complaint also fails to state

3    Dr. Niccole's authority to speak on Mentor's behalf, what was said, to whom, and when the

4    representations were made. Likely because no such facts exist. Instead, the Complaint only provides

5    a conclusory statement that Dr. Niccole is somehow imputed with Mentor's actions. Pleading

6    Intentional Misrepresentation requires more than the conclusory statements the Complaint provides.

7         Therefore, the Complaint does not and cannot plead sufficient facts to state a Cause of Action

8    against Dr. Niccole for Intentional Misrepresentation.

9         **2.**    **Plaintiffs' Fourth Cause of Action for Intentional Misrepresentation is**

10        **Uncertain.**

11        Plaintiffs claim that "Plaintiff, her physician, her device user facility, and the medical and

12   scientific community did not know that the representation made by the Defendants were false…"

13   (Complaint ¶ 259.) Dr. Niccole was Plaintiff's physician and the physician at Plaintiff's device user

14   facility. As such, Dr. Niccole cannot have both known about and concealed the risks from Plaintiff

15   while simultaneously being unaware of the risks, as the Complaint states. Consequently, Dr. Niccole

16   is uncertain whether this Cause of Action is actually pleaded against him and if so, on what facts the

17   Plaintiff is basing this allegation. Therefore, the Complaint is uncertain and unintelligible as to the

18   claim against Dr. Niccole for Intentional Misrepresentation.

19   **E.    PLAINTIFFS' FIFTH CAUSE OF ACTION DOES NOT STATE SUFFICIENT FACTS**
     **TO CONSTITUTE A CAUSE OF ACTION FOR NEGLIGENT MISPRESENTATION**

20   **AND IS UNCERTAIN**

21        For Negligent Misrepresentation, a plaintiff must prove the defendant misrepresented a

22   material fact without reasonable ground for believing it to be true and with intent to induce another's

23   reliance on the fact misrepresented, and the plaintiff justifiably relied on that misrepresentation

24   which resulted in damage. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.)

25        **1.**    **Plaintiffs' Fifth Cause of Action Does Not State Sufficient Facts to Constitute a**

26        **Cause of Action for Negligent Misrepresentation.**

27        A conclusory statement that Dr. Niccole acted in concert with Mentor, without any other

28   facts, is insufficient under California law and Code of Civil Procedure section 425.10. The

---

14

1    Complaint does not state any facts relating to how or if Dr. Niccole knew of the defects,

2    misrepresented the defects to Plaintiff, and intended for Plaintiff to rely on the misrepresentation.

3    The Complaint does not state the supposed wrongdoing of Dr. Niccole. Therefore, the Complaint

4    does not and cannot plead sufficient facts to state a Cause of Action against Dr. Niccole for

5    Negligent Misrepresentation.

6         **2.    Plaintiffs' Fourth Cause of Action for Negligent Misrepresentation is Uncertain.**

7              Plaintiffs again claim that "Plaintiff, her physician, her device user facility, and the medical

8    and scientific community did not know that the representation made by the Defendants were

9    false…" (Complaint ¶ 278.) Dr. Niccole was Plaintiff's physician and the physician at Plaintiff's

10   device user facility. As such, Dr. Niccole cannot have both known about and concealed the risks

11   from Plaintiff and also be unaware of the risks, as the Complaint states. Consequently, Dr. Niccole is

12   uncertain whether this Cause of Action is actually pleaded against him and if so, on what facts the

13   Plaintiff is basing this allegation. Therefore, the Complaint is uncertain and unintelligible as to the

14   claim against Dr. Niccole for Negligent Misrepresentation.

15   **F.    PLAINTIFFS' SIXTH CAUSE OF ACTION DOES NOT STATE SUFFICIENT FACTS
     TO CONSTITUTE A CAUSE OF ACTION FOR LOSS OF CONSORTIUM**

16

17            A loss of consortium requires (1) a valid and lawful marriage between the plaintiff and the

18   person injured at the time of the injury; (2) a tortious injury to the plaintiff's spouse; (3) loss of

19   consortium suffered by the plaintiff; and (4) the loss was proximately caused by the defendant's act.

20   (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 746.) The couple's marital status at the time the spouse

21   is tortiously injured that determines whether the plaintiff can meet the first element of a loss of

22   consortium right of action and there is no right of action for loss of consortium if the spouse's injury

23   occurred before the marriage. (*Vanhooser v. Superior Court* (2012) 206 Cal.App.4th 921, 927.)

24            Plaintiffs' Complaint does not state when Plaintiffs were married. It only states that Plaintiffs

25   are "husband and wife." (Complaint ¶ 1.) As a result, Plaintiffs have not plead that they were married

26   at the time of the injury, which is a crucial element of a loss of consortium claim.

27            Moreover, Plaintiffs have failed to state facts sufficient to constitute that Dr. Niccole was the

28   proximate cause of Plaintiff Beverly Rose's injuries. As noted above, the Complaint only states

---

15

1   Mentor's failure to report risks and follow FDA guidelines, and then imputes Dr. Niccole with a

2   conclusory statement that he is an "agent" or "alter ego" of Mentor. Plaintiffs failed to provide facts

3   of Dr. Niccole involvement or association with Mentor and do not state how Dr. Niccole contributed

4   to Plaintiff's injury. Instead, the Complaint states at least 11 times that Dr. Niccole, as the implanting

5   surgeon, had no knowledge of the risks Mentor concealed. Thus, the Complaint does not and cannot

6   plead sufficient facts to state a Cause of Action against Dr. Niccole for Loss of Consortium.

7   **G.     THE ONLY PROPER CAUSE OF ACTION PLAINTIFFS MAY PLEAD, FOR
        PROFESSIONAL NEGLIENCE, IS TIME BARRED BY THE APPLICABLE**
8       **STATUTE OF LIMITATION**

9       Dr. Niccole has been identified and referenced in the Complaint as a healthcare provider

10  rendering professional services. (Complaint, ¶ 176.) "In an action for injury or death against a health

11  care provider based upon such person's alleged professional negligence, the time for the

12  commencement of action shall be three years after the date of injury or one year after the plaintiff

13  discovers, or through the use of reasonable diligence should have discovered, the injury, whichever

14  occurs first." (Code Civ. Proc., § 340.5).

15      Based on Plaintiff's own factual admissions in the Complaint, she became aware of suspected

16  injury on November 4, 2019. On November 4, 2019, Plaintiff Beverly Rose underwent exploration to

17  "try to ensure that the ALCL did not originate in her breasts" and "it was only at surgery it was

18  discovered there was a lot of silicone gelatinous oil in and throughout the breast tissue." (Complaint,

19  ¶ 185.)

20      Thus, Plaintiffs' Complaint was untimely and barred by the statute of limitations since it was

21  not filed until November 4, 2021, after the statute of limitations expired. Based upon the above,

22  Dr. Niccole respectfully requests his Demurrer be granted as to Plaintiffs' Complaint for a Cause of

23  Action more properly plead as Professional Negligence.

24  **H.     PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND**

25      Leave to amend should be granted only where a plaintiff can show the pleading can be

26  amended. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) This Complaint is void of facts stating

27

28

Exhibit A - Page 94

a Cause of Action against Dr. Niccole. In fact, the Complaint even states 11 times that Dr. Niccole, as the implanting surgeon, did not and could not have known about the risks. Thus, Dr. Niccole respectfully asks this Court to sustain the Demurrer without leave to amend.

## V.
## CONCLUSION

Based on the foregoing reasons, Dr. Niccole respectfully asks this Court to sustain his Demurrer as to all Causes of Action without leave to amend.

Dated: January 10, 2022                    NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC


By: _____
                    Robert W. Frank
                    Marisa D. Sarti
                    Attorneys for Defendant
                    MICHAEL NICCOLE, M.D.

---

17

**Beverly Rose and Jack Rose v. Michael Niccole, MD, et al.**
SDSC Case No. 37-2021-00046860-CU-PL-NC

**PROOF OF SERVICE**
[Code Civ. Proc., §§ 1013A (3) and 2015.5]

I, the undersigned, am employed in the county of San Diego, State of California.  I am over the age of 18 and not a party to the within action; my business address is 110 West A Street, Suite 1200, San Diego, California 92101.  On this same day, I served the foregoing document(s) described as

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MICHAEL NICCOLE, M.D.'S DEMURRER TO PLAINTIFFS' COMPLAINT**

on the parties in this action named herein:

Jennifer A. Lenze, Esq.                          **Attorneys for Plaintiffs:**
LENZE LAWYERS, PLC                       BEVERLY ROSE and JACK G. ROSE
1300 Highland Avenue, Suite 207
Manhattan Beach, CA  90266
Tel.:    (310) 322-8800
Fax:    (310) 322-8811
jlenze@lenzelawyers.com

☒     **BY ELECTRONIC TRANSMISSION VIA EMAIL** – By e-mailing the document(s) to the persons at the e-mail address(es) above.  This is necessitated during the declared national emergency due to the Coronavirus (COVID-19) pandemic.  Hard copies will be provided upon request.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on January 10, 2022 at San Diego, California.

Cindy Frederick

1   Robert W. Frank, SBN 95392
2   Marisa D. Sarti, SBN 330746
    NEIL, DYMOTT, FRANK, MCCABE & HUDSON
3   A Professional Law Corporation
    110 West A Street, Suite 1200
4   San Diego, CA 92101
    **P** 619.238.1712 / **F** 619.238.1562
5
6   Attorneys for Defendant
    MICHAEL NICCOLE, M.D.
7

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/10/2022** at 01:54:00 PM
Clerk of the Superior Court
By Ashley Carini, Deputy Clerk

8
9           **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

10          **COUNTY OF SAN DIEGO – NORTH COUNTY DIVISION**

11  BEVERLY ROSE AND JACK G. ROSE,      )   CASE NO. 37-2021-00046860-CU-PL-NC
    wife and husband,                   )   *[IMAGED FILE]*
12                                      )
            Plaintiffs,                 )   **DECLARATION OF MARISA D. SARTI**
13                                      )   **IN SUPPORT OF DEFENDANT**
    vs.                                 )   **MICHAEL NICCOLE, M.D.'S**
14                                      )   **DEMURRER**
    MICHAEL NICCOLE, M.D.; MENTOR       )
15  WORLDWIDE, LLC and DOES 1-100,      )   **RESERVATION NO. 2471871**
    inclusive,                          )   Hearing Date:   04/15/22
16                                      )   Hearing Time:   1:30 p.m.
            Defendants.                 )
17                                      )   Judge: Hon. Robert P. Dahlquist
                                        )   Dept.: N-29
18  _____)   Filed: 11/04/21

19  I, Marisa Sarti, declare:

20          I am an attorney at law licensed to practice before this court. I am an associate in the law firm

21  of NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC. Our office represents Defendant

22  MICHAEL NICCOLE, M.D. in the above-captioned matter. As such, I am familiar with the facts

23  regarding this matter and if called as a witness, could and would competently testify to the following:

24          1.      On December 23, 2021, Defendant Dr. Niccole's response to Plaintiff's Complaint was

25  due. On that day, Plaintiffs' counsel granted an extension to respond to the Complaint until January 10,

26  2022. Attached as Exhibit A is a true and correct copy of the email discussion between counsel on

27  December 22 and December 23, 2021.

28

00474288.DOCX

                                            1
**DEFENDANT MICHAEL NICCOLE, MD'S DEMURRER TO PLAINTIFFS' COMPLAINT**

2.     On December 28, 2021, I sent a meet and confer letter to Plaintiffs' counsel regarding the issues addressed in the demurrer, in accordance with Code of Civil Procedure section 430.41(a). The letter requested Plaintiffs' counsel respond by January 3, 2022, five days before the Demurrer motion was due. Attached as Exhibit B is a true and correct copy of the meet and confer letter sent on December 28, 2021.

3.     After not receiving a response to the meet and confer letter, I emailed Plaintiffs' counsel on January 4, 2022, to follow up on the meet and confer letter sent. Attached as Exhibit C is a true and correct copy of the email I sent to counsel on January 4, 2022. I did not receive a response.

4.     On January 5, 2022, I called Plaintiffs' counsel directly to meet and confer. Ms. Lenze was not available, and her office assistant took a message. I did not receive a call back.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and as to matters stated based on information and belief, I believe that they are true and correct.  Executed at San Diego, California on January 10, 2022.


_____
Marisa D. Sarti, Esq.

00474288.DOCX

2

**DEFENDANT MICHAEL NICCOLE, MD'S DEMURRER TO PLAINTIFFS' COMPLAINT**

1    **Beverly Rose and Jack Rose v. Michael Niccole, MD, et al.**

2    SDSC Case No. 37-2021-00046860-CU-PL-NC

3

4    **PROOF OF SERVICE**
     [Code Civ. Proc., §§ 1013A (3) and 2015.5]

5    I, the undersigned, am employed in the county of San Diego, State of California. I am over the age of

6    18 and not a party to the within action; my business address is 110 West A Street, Suite 1200, San Diego, California 92101. On this same day, I served the foregoing document(s) described as

7    **DECLARATION OF MARISA D. SARTI IN SUPPORT OF DEFENDANT MICHAEL NICCOLE, M.D.'S DEMURRER**

8

9    on the parties in this action named herein:

10 Jennifer A. Lenze, Esq.             <u>**Attorneys for Plaintiffs**</u>:
     LENZE LAWYERS, PLC         BEVERLY ROSE and JACK G. ROSE
     1300 Highland Avenue, Suite 207

11 Manhattan Beach, CA 90266
     Tel.:    (310) 322-8800

12 Fax:    (310) 322-8811
     jlenze@lenzelawyers.com

13

14

15 ☒     **BY ELECTRONIC TRANSMISSION VIA EMAIL –** By e-mailing the document(s) to the persons at the e-mail address(es) above. This is necessitated during the declared national emergency

16 due to the Coronavirus (COVID-19) pandemic. Hard copies will be provided upon request.

17 I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

18

19 Executed on January 10, 2022 at San Diego, California.

20

21 Cindy Frederick

22

23

24

25

26

27

28

00474288.DOCX

# EXHIBIT A

**Marisa Sarti**

| | |
|---|---|
| **From:** | Marisa Sarti |
| **Sent:** | Wednesday, December 22, 2021 11:16 AM |
| **To:** | jlenze@lenzelawyers.com |
| **Subject:** | Rose v. Niccole, et al |

Good morning,

I, along with my firm, represent Dr. Niccole in the above referenced matter. Are you amenable to an extension until 1/10/22 for Dr. Niccole's response to the Complaint? Please let me know.


Thank you,

**Marisa Sarti, Esq.**
NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC
110 West A Street, Suite 1200
San Diego, CA 92101-3711
Phone: (619) 238-1712
Direct Dial: (619) 238-2251
Fax: (619) 238-1562


*Member of Primerus Alliance of law firms*

**Confidentiality Notice**
This message is being sent on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

1

**Marisa Sarti**

| | |
|---|---|
| **From:** | Jennifer Lenze <jlenze@lenzelawyers.com> |
| **Sent:** | Thursday, December 23, 2021 8:17 AM |
| **To:** | Marisa Sarti |
| **Subject:** | Re: Rose v. Niccole, et al |

Absolutely.

Get Outlook for iOS

**From:** Marisa Sarti <msarti@neildymott.com>
**Sent:** Thursday, December 23, 2021 8:15:26 AM
**To:** Jennifer Lenze <jlenze@lenzelawyers.com>
**Subject:** FW: Rose v. Niccole, et al

Following up on the email below. Please advise.

Thank you,
Marisa Sarti

**From:** Marisa Sarti
**Sent:** Wednesday, December 22, 2021 11:16 AM
**To:** jlenze@lenzelawyers.com
**Subject:** Rose v. Niccole, et al

Good morning,

I, along with my firm, represent Dr. Niccole in the above referenced matter. Are you amenable to an extension until 1/10/22 for Dr. Niccole's response to the Complaint? Please let me know.

Thank you,

**Marisa Sarti, Esq.**
NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC
110 West A Street, Suite 1200
San Diego, CA 92101-3711
Phone: (619) 238-1712
Direct Dial: (619) 238-2251
Fax: (619) 238-1562

*Member of Primerus Alliance of law firms*

**Confidentiality Notice**
This message is being sent on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

1

# EXHIBIT B

# **Neil Dymott**
### ATTORNEYS

Neil, Dymott, Frank, McCabe & Hudson
A Professional Law Corporation
110 West A Street, Suite 1200
San Diego CA 92101
P 619.238.1712
F 619.238.1562

www.neildymott.com

San Diego • Palm Desert

Marisa D. Sarti
Direct 619.238.2251
msarti@neildymott.com

December 28, 2021

Jennifer A. Lenze, Esq.
Lenze Lawyers, PLC
1300 Highland Avenue, Suite 207
Manhattan Beach, CA  90266
jlenze@lenzelawyers.com

   **Re:**  *Rose v. Niccole, et al.*
      **Meet and Confer – Complaint**

Dear Ms. Lenze:

  Please allow this to serve as my attempt to meet and confer pursuant to CCP section 430.41 as to the Complaint against my client, Dr. Michael Niccole.  The Complaint includes causes of action for general negligence, strict products liability, intentional and negligent misrepresentation, and loss of consortium against Dr. Niccole.

  It is our position the causes of action pled are improper. Dr. Niccole is not and never has been an employee, agent, or representative of Mentor. As such, he had no knowledge of the risks that Mentor concealed from physicians and patients, as the Complaint suggests. However, all causes of actions are pled under the assumption Dr. Niccole was employed by Mentor, and participated in the implants' manufacturing, marketing, and distribution, making him aware of the risks that Mentor concealed. No facts or evidence have been included in or attached to the Complaint to establish such a relationship (likely because it does not exist). Therefore, the causes of action do not and cannot apply to Dr. Niccole and therefore improper under CCP sections 430(e) and (f).

  Dr. Niccole was solely Plaintiff's physician who performed the breast implant procedure. As the Complaint states, in paragraph 198, Mentor provided "insufficient warning to alert consumers and *their prescribing physicians* that the Silicone Textures Breast Implants posed an unreasonably high risk of cause BIA-ALCL" and "knowingly and deliberately failed under 21 C.F.R. 814.39(d) to: warn the public, including Plaintiff *and her physician,* of the serious risk that their product poses in the development of BIA-ALCL." (Emphasis added). The Complaint states that Dr. Niccole was Plaintiff's prescribing physician. See Complaint, paragraph 178. Dr. Niccole was **not** an employee, agent, or representative of Mentor. However, the Complaint fails to state or establish how Dr. Niccole (but not other prescribing physicians) knew or should have known about the risks. Therefore, the Complaint is vague, ambiguous, inconsistent within

MEMBER, INTERNATIONAL SOCIETY OF PRIMERUS LAW FIRMS 

# Neil Dymott

Jennifer A. Lenze, Esq.
December 28, 2021
Page 2

---

the causes of action, and do not state facts sufficient to support the causes of action, thus making the causes of action improper and inapplicable to Dr. Niccole.

Further, the Complaint is not timely filed and barred by the applicable statute of limitations outlined in CCP section 340.5. As noted above, the Complaint states that healthcare providers and prescribing physicians, such as Dr. Niccole, could not have known about the risks because of Mentor's concealment. Consequently, Dr. Niccole could not have known about the risks and thus concealed those risks from Plaintiff. As such, there is a one (1) year statute of limitations to bring any professional negligence claim against Dr. Niccole. See CCP section 340.5. At the very latest, the statute of limitations began running on November 4, 2019, when Plaintiff was informed her breast implants caused her illness.

Based upon these reasons, it is our hope that you will agree to dismiss our client from the lawsuit. Please find an outline of our position below.

## 1.   Strict Product Liability (First and Second Causes of Action)

Strict products liability claims require that defendants directly or indirectly manufactured, tested, marketed, sold, and commercially distributed the products. See Complaint, paragraphs 196 and 112. Dr. Niccole is only a physician who performed the Plaintiff's procedure. Throughout the First and Second causes of action, the Complaint states that Mentor failed to warn and inform patients and their physicians of the risks associated with the implants. Dr. Niccole is one of the physicians that Mentor concealed the risk from, yet he is included in these causes of action. The Complaint does not discuss Dr. Niccole's relationship to the Mentor implants at all. No evidence has been provided or attached to the Complaint to show such a relationship exists. The causes of action simply include Dr. Niccole without establishing the key elements of manufacturing and distributing.

Consequently, the Complaint does not and cannot plead sufficient facts to state a cause of action against Dr. Niccole for strict products liability. For these reasons, the Complaint is also uncertain and unintelligible. Therefore, the First and Second Causes of Action are improper.

## 2.   Negligence (Third Cause of Action)

Plaintiff improperly alleges a claim for general negligence against this defendant when it should be a claim for professional negligence because Dr. Niccole was a healthcare provider rendering professional services. Again, general negligence is not proper because Dr. Niccole did not manufacture, test, market, sell, and commercially distribute the implants. The Complaint does not state any facts to establish that Dr. Niccole did manufacture, test, market, sell, and commercially distribute the implants. As such, Dr. Niccole cannot have had a duty to warn or report, as he is not an employee, agent, or representative of Mentor and was not aware of any risks. The Complaint also does not state how Dr. Niccole could have known about the risks;

# Neil Dymott

Jennifer A. Lenze, Esq.
December 28, 2021
Page 3

rather, the Complaint claims that prescribing physicians had such information concealed from them. Dr. Niccole was a Plaintiff's prescribing physician.

Consequently, the Complaint does not and cannot plead sufficient facts to state a cause of action against Dr. Niccole for general negligence. For these reasons, the Complaint is also uncertain and unintelligible. Therefore, the general negligence cause of action is improper.

### 3. Intentional and Negligent Misrepresentation (Fourth and Fifth Cause of Action)

The Complaint states the basis for the intentional and negligent misrepresentation claims contained in the Fourth and Fifth causes of action are due to "Defendant superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and danger of BIA-ALCL and their international dissemination of promotional and marketing information…" See Complaint, paragraphs 246 and 265.

As you are aware, the Fourth Cause of Action for fraud requires a heightened pleading standard. "To state an action for deceit or fraud, a plaintiff must allege a misrepresentation made with knowledge of its falsity and with the intent to defraud, i.e., to induce reliance; the reliance must be justifiable and damages alleged must be a proximate result." (*O'Hara v. Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 805; *See also De Seeger v. Odell* (1941) 18 Cal.2d 409, 414; *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 128.)

The Complaint does not establish Dr. Niccole's relationship with manufacturing the implants, disseminating the implants' information, or his alleged involvement in this "fraudulent scheme." The Complaint claims that doctors were unaware of the risks. Dr. Niccole was the prescribing doctor. Therefore, according to the facts alleged in the Complaint, it was impossible for Dr. Niccole to be aware of these risks as he was only the prescribing doctor.

Therefore, the Fourth and Fifth causes of actions are confusing, inconsistent, and improper. The causes of actions do not and cannot plead facts sufficient for misrepresentation causes of action.

### 4. Loss of Consortium (Sixth Cause of Action)

The Complaint fails to allege how Dr. Niccole caused any injuries or damage to Plaintiffs. As a result, a loss of consortium claim against Dr. Niccole is improper.

### 5. Plaintiff's Lawsuit is Barred by the Statute of Limitations

Even if Plaintiffs amend their Complaint to add professional negligence, the suit is time barred. "In an action for injury or death against a health care provider based upon such person's

# Neil Dymott

Jennifer A. Lenze, Esq.
December 28, 2021
Page 4

---

alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." CCP section 340.5.

Plaintiff alleges she discovered her implants caused her illness on November 4, 2019. As outlined above, the Complaint states that healthcare providers and prescribing physicians, such as Dr. Niccole, could not have known about the risks because of Mentor's concealment. Consequently, Dr. Niccole could not have known about the risks and thus concealed those risks from Plaintiff. As such, there is a one (1) year statute of limitations to bring any professional negligence claim against Dr. Niccole. See CCP section 340.5. At the very latest, the statute of limitations began running on November 4, 2019, when Plaintiff was informed her breast implants caused her illness.

Please provide our office with a response by Monday, January 3, 2022. Thank you for your anticipated professional courtesy and cooperation. I look forward to hearing from you.

Very truly yours,

Neil, Dymott, Frank, McCabe & Hudson APLC

Marisa D. Sarti

MDS/caf

# EXHIBIT C

**Marisa Sarti**

| | |
|---|---|
| **From:** | Marisa Sarti |
| **Sent:** | Tuesday, January 4, 2022 9:34 AM |
| **To:** | Jennifer Lenze |
| **Subject:** | RE: Rose v. Niccole, et al |
| **Attachments:** | NICCOLE-Rose - LTPL - Meet and Confer to J. Lenze re Complaint (00473584x9DEFC).PDF |

Good afternoon,

I sent the attached meet and confer letter last week, but I have not heard back yet. Please call or email me to discuss.

Thank you,

**Marisa Sarti, Esq.**
NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC
110 West A Street, Suite 1200
San Diego, CA 92101-3711
Phone: (619) 238-1712
Direct Dial: (619) 238-2251
Fax: (619) 238-1562

*Member of Primerus Alliance of law firms*

**Confidentiality Notice**
This message is being sent on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

---

**From:** Jennifer Lenze <jlenze@lenzelawyers.com>
**Sent:** Thursday, December 23, 2021 8:17 AM
**To:** Marisa Sarti <msarti@neildymott.com>
**Subject:** Re: Rose v. Niccole, et al

Absolutely.

Get Outlook for iOS

---

**From:** Marisa Sarti <msarti@neildymott.com>
**Sent:** Thursday, December 23, 2021 8:15:26 AM
**To:** Jennifer Lenze <jlenze@lenzelawyers.com>
**Subject:** FW: Rose v. Niccole, et al

Following up on the email below. Please advise.

Thank you,
Marisa Sarti

---

**From:** Marisa Sarti
**Sent:** Wednesday, December 22, 2021 11:16 AM
**To:** jlenze@lenzelawyers.com
**Subject:** Rose v. Niccole, et al

Good morning,

I, along with my firm, represent Dr. Niccole in the above referenced matter. Are you amenable to an extension until 1/10/22 for Dr. Niccole's response to the Complaint? Please let me know.


Thank you,

**Marisa Sarti, Esq.**
NEIL, DYMOTT, FRANK, MCCABE & HUDSON APLC
110 West A Street, Suite 1200
San Diego, CA 92101-3711
Phone: (619) 238-1712
Direct Dial: (619) 238-2251
Fax: (619) 238-1562


*Member of Primerus Alliance of law firms*

**Confidentiality Notice**
This message is being sent on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Exhibit A - Page 110